213 So.2d 823

### STATE TENURE COMMISSION

v.

### MADISON COUNTY BOARD OF EDUCATION.

8 Div. 189.

Supreme Court of Alabama.

July 25, 1968.

Rehearing Denied Sept. 19, 1968.

660

MacDonald Gallion, Atty. Gen., Wm. N. McQueen, Asst. Atty. Gen., and Roscoe Roberts, Jr., Sp. Asst. Atty. Gen., for appellant.

Ford, Caldwell, Ford & Payne, Hunts-
ville, for appellee.

**662**

KOHN, Justice.

After a contested hearing, the Madison County Board of Education cancelled the employment contract of one J. D. Wigley, a Vocational Agricultural teacher who had acquired a continuing service status, usually termed "tenure." Hereinafter in this opinion, we shall refer to Mr. Wigley as the teacher. Within the time provided, the teacher appealed to the State Tenure Commission. The hearings before the Madison County Board of Education, and the appeal to the State Tenure Commission were both pursuant to Chapter 13, § 351 et seq., Title 52, Code of Alabama, 1940, as amended. Section 359, supra, sets out the mode of cancellation of tenure teachers' employment contracts. Grounds for cancellation of such employment contracts are covered by § 358, supra. The grounds are: (1) Incompetency; (2) insubordination; (3) neglect of duty; (4) immorality; (5) justifiable decrease in the number of teacher positions; (6) or other good and just cause. But, *cancellation may not be made for political or personal reasons,* and we would like to emphasize this last clause which we feel played a part in the original proceedings involved in this case.

Section 360, supra, makes the actions of the employing board, which was in this case the Madison County Board of Education, final in its action on cancellation of teachers' contracts, provided such action was in compliance with the provisions of Chapter 13, supra, and was not arbitrarily unjust. This same section provides the teacher a right to appeal to the State Ten-

ure Commission in order to obtain a review by such Tenure Commission as to whether such action of the employing board—in this case the Madison County Board of Education—was in compliance with Chapter 13, supra; and whether such action was *arbitrarily unjust.*

Chapter 13A is supplemental to Chapter 13. Section 361(8) of Chapter 13A of Title 52, supra, makes it the duty of the State Tenure Commission to hear and determine appeal cases, as provided in § 360, Title 52, as amended, and states that the decisions of the State Tenure Commission shall be final to the extent provided by § 361. Section 361 of Title 52, supra, makes the action of the State Tenure Commission in reviewing cancellation of teachers' contracts, if made in compliance with the provisions of Chapter 13, and unless *unjust,* final and conclusive. Section 361, supra, also provides for a review from the State Tenure Commission ruling by petition of mandamus filed in the circuit court of the county where the school system involved is located, and the question reviewed is whether such action of the State Tenure Commission complies with the provisions of this Chapter, and whether such action by the Commission was unjust.

The State Tenure Commission held that the action of the Madison County Board of Education, in cancelling the contract of the teacher, was arbitrary and unjust. The judgment of the Madison County Board of Education is set out below, and also the decision of the State Tenure Commission:

"MINUTES OF MADISON COUNTY BOARD OF EDUCATION

"SEPTEMBER 25, 1963—6:30 P.M.— KINGS INN

"Within five (5) days of the last hearing day and on September 25, 1963, the Board met in special called session

at 6:30 P.M. to consider the evidence in the matter of the proposed cancellation of Mr. J. D. Wigley's contract as teacher of vocational agriculture in the Buckhorn High School, with the following members present: L. E. Hereford, Wm. L. Vaughn, Atlas Carriger, Donald Spencer and Herman B. Sanders.

"After due and careful consideration the Madison County Board of Education found the charges proved on Specifications 1, 2, 3, 5, 6, 8, 9, 10, and 11, and that portion of Specification 12 reading 'the said J. D. Wigley has exhibited a pattern of failure or refusal to cooperate in the schools in the Madison County School System in which he has served' and 'he has failed to uphold and maintain the authority vested in the principals of the schools wherein he has been employed.' The remainder of Specification XII was either not proved or was covered by preceding specifications.

"The Board then unanimously voted to cancel the contract of the said J. D. Wigley.

"A motion was offered by Mr. Carriger and seconded by Mr. Sanders, and carried, authorizing the Superintendent of Education to officially notify Mr. J. D. Wigley and attorney, Roscoe Roberts, of the Board's decision to cancel his contract as teacher of vocational agriculture at the Buckhorn High School.

"There being no further business to come before the Board the meeting was adjourned."

"Findings of the Alabama Tenure Commission in the Case of J. D. Wigley.

"The commission after due consideration found by unanimous vote that the requirements of the statute in connection with the action of the Madison County Board of Education in canceling the contract of J. D. Wigley were complied with.

"The question was put to the commission as to whether or not the Madison County Board of Education was arbitrarily unjust in canceling the contract of J. D. Wigley. The vote was three to two in the affirmative and the commission determined that the Madison County Board of Education was arbitrarily unjust in its decision canceling J. D. Wigley's contract."

The Madison County Board of Education filed a petition for mandamus in the circuit court of Madison County, and that court set aside the action of the State Tenure Commission. The judgment of the Madison County circuit court is set out below:

"Issue being joined between the Petitioners and Respondents this cause is submitted to the Court upon the evidence taken in open Court and the certified transcription of the record of the proceedings before the Madison County Board of Education.

"Upon consideration of same the Court is of the opinion that while the testimony given at the hearing before the Madison County Board of Education was in conflict, there was evidence, which if found to be true by such Board, supported certain of the specifications and grounds for the cancellation of the employment of Mr. J. D. Wigley by the Board of Education.

"The Court is further of the opinion that in order for the action of the Madison County Board of Education to have been arbitrarily unjust there must have been no legal evidence to support any of the statutory grounds for cancellation found to exist by such Board.

"The Court is further of the opinion that the action of the Respondents was unjust in holding that the action of the Madison County Board of Education was arbitrarily unjust in that it is an attempt to set aside the finding of the Madison County Board of Education made within

**664**

the scope of the power delegated to that Board, the Madison County Board of Education having evidence before it which, if believed, justified its action.

"The Court is further of the opinion that the action of the State Tenure Commission, also known as Alabama Tenure Commission in determining that the Madison County Board of Education was arbitrarily unjust in its decision cancelling J. D. Wigley's contract should be revoked and held to be null and void.

"The Court is further of the opinion the Petitioners are entitled to the relief prayed for in their amended petition.

"It is therefore ordered and adjudged by the Court that the action of the State Tenure Commission or its members in finding that the cancellation of the contract of J. D. Wigley was arbitrarily unjust be and the same is revoked and held to be null and void and that a preemptory writ of mandamus forthwith issue from this Court directed to the State Tenure Commission or Howell T. Heflin, as Chairman of such Commission and Mrs. Lula Moss, Miss Katherine Killebrew, Oscar Zeanah, J. Tom Green, Mrs. William Lawrence and Mrs. John Lathram requiring them to revoke, repeal and rescind the finding that the decision of the Madison County Board of Education in revoking the contract of J. D. Wigley was arbitrarily unjust."

Thereupon the State Tenure Commission, hereafter called the Commission, appealed from the decision of the circuit court to this court.

The hearing before the Madison County Board of Education was taken down and subscribed, and the transcript of such hearing was used at the hearing before the Commission, and in the circuit court at the mandamus hearing. The case was not tried ore tenus by the circuit court. On August 17, 1963, the teacher, who was not a party to this appeal, received notice by letter that his contract of employment

would be considered for cancellation due to "incompetency in respect to the manner in which the students in your vocational agricultural classes are taught by you; insubordination in your willful refusal to obey the reasonable rules and regulations of the Board of Education of Madison County, Alabama, the Madison County Superintendent of Schools and the Principals of the schools in which you have taught; neglect of duty in your failing to give the students in the vocational agricultural classes taught by you the necessary training, guidance, instruction and teacher leadership required by the Board of Education, especially in the field of class and shop training in keeping with the Vocational Department of the State Department of Education as outlined by said Department, and for good and just cause in having been a party to trickery and fraud in exhibiting cattle or livestock by students under your supervision as a teacher in the county schools in livestock shows or competition."

After insistence by the teacher, detailed reasons or specifications for the proposed cancellation were provided him. The County Board of Education, it will be seen, found that the charges, as set out in Specifications 1, 2, 3, 5, 6, 8, 9, 10, 11 and part of 12, were proved. The Specifications, running 1 through 12, are as follows:

### "SPECIFICATION I

"In, to-wit: April, 1962, said J. D. Wigley knowingly permitted calves of Patsy Payne entered and exhibited or offered for exhibit in the 4H, FFA, or FHA Fat Calf Show to be tattooed on or about four days before the Fat Calf Show was held in, to-wit, April, 1962, in violation of the rules and regulations governing such show and requiring such tatooing under the supervision of the Extension or Vocational Agricultural Worker by November 30 of each year, the said Patsy Payne being a student under the supervision of the said J. D. Wigley, who was then the vocational

agriculture teacher of Buckhorn High School in Madison County, Alabama.

## "SPECIFICATION II

"The said J. D. Wigley in violation of the rules and regulations of the 4H, FFA and FHA Fat Calf Show knowingly permitted calves fed on the premises of one Carey Ayers or his father to be shown or offered for showing at the 4H, FFA, and FHA Fat Calf Show in April, 1962, by T. J. Campbell, the said T. J. Campbell being at the time a student under the supervision of the said J. D. Wigley.

## "SPECIFICATION III

"The said J. D. Wigley on to-wit, March 12, 1962, being then in charge of the land judging team from the Vocational Agriculture Department of Buckhorn High School, did fail to appear with said team for the land judging contest held at Gurley, Alabama, under the auspices of Madison County Soil Conservation District in neglect of his duty so to do, and after having been ordered to so appear by the principal of Buckhorn High School,

## "SPECIFICATION IV

"In, to-wit, September, 1960, and to-wit, September, 1961, William F. McFarlen, being then a student of vocational agriculture under the said J. D. Wigley, desired to show a Jersey Cow at the Madison County Fair in such years and the said J. D. Wigley assured his student that the necessary arrangements for the entry of the said cow for showing in the Madison County Fairs of such years would be made by him, the said J. D. Wigley. Relying on said promises, William F. McFarlen prepared the cow for showing but the said J. D. Wigley did not make the necessary arrangements for the entry of said cow for showing in the Madison County Fairs and the said student, William F. McFarlen, thereby was deprived of or lost the opportunity of advancing his knowledge and education in vocational agriculture.

## "SPECIFICATION V

"From around the time of the opening of Buckhorn High School in 1958, and during the employment of J. D. Wigley as the vocational agriculture teacher at said school, there was in effect a rule or regulation, duly promulgated and put into effect by the principal of said school, which provided, in effect, that no teacher or student could leave the school grounds during school hours without first stopping by the office of the principal and informing the principal of the reason for leaving, obtaining the permission of the principal to leave, and stating the time of the expected return. The said J. D. Wigley on January 26, 1960; December 16, 1959; December 7, 1959, and divers other occasions, while such a teacher and subject to such rule or regulation, repeatedly violated said rule.

## "SPECIFICATION VI

"At the commencement of the school year in 1962, the principal of Buckhorn High School required that the said J. D. Wigley, who was then a teacher at Buckhorn High School and under the jurisdiction of the principal thereof, furnish the principal with a list of the students who had outside projects in vocational agriculture and that the said J. D. Wigley furnish him with progress notes on how these children progressed and performed their outside projects. The said J. D. Wigley neglected or refused to furnish the said principal of the Buckhorn High School with such a list and such information.

## "SPECIFICATION VII

"From, to-wit, the opening of the Buckhorn High School in 1958, there was in effect and duly promulgated by the principal of the Buckhorn High School, a rule or regulation to the effect that all teachers must be in their classrooms ready to start teaching when the tardy bell rang. The said J. D. Wigley consistently violated this rule.

## "SPECIFICATION VIII

"As the vocational agriculture teacher for the Buckhorn High School, the said J. D. Wigley was responsible for the planting of the shrubbery and the beautifying of the school grounds. Although shrubbery was available or could be obtained for planting purposes, and although the principal of the Buckhorn High School repeatedly insisted that the said J. D. Wigley plant said shrubbery, the said J. D. Wigley refused or neglected to do so.

## "SPECIFICATION IX

"As the vocational agriculture teacher of the Buckhorn High School, the said J. D. Wigley was responsible for the care and safe-keeping of the tools and vocational equipment in the Vocational Agriculture Department. The said J. D. Wigley failed to properly care for said tools in that no proper places for their safe-keeping were provided, the door to the shop was not kept locked when not in use as a classroom, the tools and equipment were scattered over the classroom rather than kept in an orderly fashion, and the tools and equipment were not maintained nor properly and adequately inventoried.

## "SPECIFICATION X

"That the said J. D. Wigley, while a teacher at Buckhorn High School and during the period of time the said J. D. Wigley was responsible for conducting classes, would and did sleep in classes and while so doing, suffer or allow the pupils in his class to leave the classroom or read periodicals, all during the period of time the said J. D. Wigley was charged with conducting classes.

## "SPECIFICATION XI

"The said J. D. Wigley in 1955 and thereafter, while a teacher in the Madison County School System and while holding or conducting FFA meetings during school hours encouraged and fostered the students in his classes and the members of the FFA in the use of profane, lewd or vulgar language and the said J. D. Wigley gave a prize or reward to the member of such class or association who could and did, at the end of the monthly meetings of the FFA, tell to the group the story or joke which was voted to be the most profane, lewd, obscene or dirty.

## "SPECIFICATION XII

"The said J. D. Wigley has exhibited a pattern of failure or refusal to cooperate in the schools in the Madison County School System in which he has served or he has exhibited an incapacity or unfitness to discharge the duties of his position in that he has failed to keep and maintain order in the classrooms, he has failed to require the students to be in their classrooms on time and to remain therein during the entire classroom period, he has failed to uphold and maintain the authority vested in the principals of the schools wherein he has been employed, he has allowed vulgar or obscene stories or jokes to be told in his classrooms, he has failed to establish and teach a thorough, complete and rounded vocational educational program."

We shall discuss these specifications in the order they were enumerated.

*As to Specification I.* The teacher denied that the person who handled and exhibited or offered for exhibit the tattooed calf was a member of FFA, and also denied that she was a member of his vocational agricultural class; that he had just volunteered to help her when he tattooed the calf. He stated the reason for having the calves tattooed is that it is hard to get the parents and the children to start feeding the calves early enough so "they would look well enough to put in the show." This was the teacher's explanation for the rule concerning a particular time for tattooing a calf to be exhibited, and also, to insure the calf was owned at the required time by the person who was going to show it.

The evidence, as shown by the record, is not convincing that the teacher was guilty

of any dereliction, as charged by Specification I, that would make him incompetent, or guilty of insubordination, or neglect of his duty, or immorality, nor was there proved any "other good and just cause."

*As to Specification II.* We think there is a failure of proof in the evidence of anything that would come within the grounds set out in § 358, supra, for cancellation as set out in such statute.

*As to Specification III.* We think the evidence refutes the charge in that, under the circumstances as disclosed by the record, there was no neglect of duty or insubordination.

*As to Specification IV.* There was no verdict or judgment against the teacher under this specification.

*As to Specification V.* This specification concerns an unwritten rule promulgated and put into effect by the principal of the school, which provided that no teacher could leave the school grounds, during school hours, without first stopping by the office of the principal and informing the principal of the reason for leaving and obtaining permission to do so. We think such a charge is so spurious, and without substance, that it should not have been the basis of a specification. Furthermore, it is glaringly defective and not due process, in that it refers to special dates—January 26, 1960, December 16, 1959, and December 7, 1959—and then states "and divers other occasions," but does not designate these other occasions. It should be remembered that after these dates complained of, the teacher was an approved teacher in the school and served subsequent terms. Such alleged violations, even if proven, were condoned and waived for all periods other than the last school year served by the teacher before the written complaint against him (August 17, 1963), for prior to that time he had served without complaint, and we are using the word "complaint" meaning the statutory basis for cancelling a teacher's contract. The record discloses that the teacher usually left a written note as to

where he was going and why, when he left the school grounds during school hours.

*As to Specification VI.* We think the evidence discloses that the teacher was not guilty of any substantial or flagrant violation of the regulations governing such lists. We hold there was a failure of proof as to this charge.

*As to Specification VII.* There was no verdict or judgment against the teacher under this specification.

*As to Specification VIII.* We think the evidence fails to bear out the contentions of this specification. We think the testimony of witness Faulkner refutes this specification and we refer to his testimony later in this opinion. Furthermore, the record discloses the teacher did undertake to plant shrubbery, and he explained the circumstances surrounding this particular duty.

*As to Specification IX.* We think the evidence from the record utterly fails to establish the allegations of this specification.

*As to Specification X.* We think this specification could not properly be the basis for a charge, in that it was too vague and indefinite to come within the grounds for cancellation as enumerated in § 358, supra. It does not set out the time or the year. During the several years that the teacher was conducting his classes, there was no substantial evidence that established at any time this teacher was asleep. Out of all the witnesses subpoenaed, an infinitesimal few testified that his head was down and his eyes closed. This court can take judicial knowledge of the fact that simply because a man's head is bowed down, and his eyes closed, does not necessarily or conclusively establish that he is asleep. They simply observed him from a distance and concluded that he was asleep. This specification was not proved under the evidence in the transcript.

*As to Specification XI.* This specification should have been thrown out by

the Board itself, in that it refers to something that happened in 1955, when it is clear from the record that many years after 1955, this teacher was subsequently employed by the County Board of Education. Therefore, this specification was stale, and the things alleged were condoned, waived or approved by his being allowed to teach from year to year subsequent to the happening of the things complained of. The specification is further defective in that it says that "he encouraged and fostered the students in his classes and the members of the FFA in the use of profane, lewd or vulgar language." Nowhere in the specification are any curse words set out. This may be the place to comment that what is cursing to one person, may not be cursing to another. Not over three witnesses gave testimony tending to support this specification. The evidence in the record overwhelmingly refutes the allegations of this specification. Student after student testified that no obscene or dirty language was heard by them in either FFA or vocational agricultural classes. They said that at these FFA meetings, there was a dollar prize for the boy telling the funniest joke. It is obvious from the record that this program was arranged to develop poise, confidence and ability in the students to speak on their feet at the meetings.

No witness testified that he had ever heard the teacher use profane or obscene language. The teacher emphatically denied the charges relative to such cursing or the encouraging thereof.

*As to Specification XII.* This specification contains a general summary of charges, or a repeating of charges. The first part of the specification, as to any incompatibility or unfitness or refusal to cooperate, we think the results obtained by the teacher in the success of carrying out his duties utterly refutes this part of the allegations of Specification XII. We likewise fail to find any substantial evidence establishing the teacher's failure to require the students to be in their classroom on time and to remain there. We further find no substantial evidence establishing that the teacher failed to respect the authority vested in the principal of the school where he had been employed. We further fail to find, from the record, any substantial evidence that establishes the failure on the part of the teacher to teach a thorough, round and complete vocational program. This perhaps is the proper place to comment further on the ability of the teacher. Only an infinitesimal few former pupils testified against him, yet countless former students testified in his behalf in glowing tributes. It is clear from a careful reading of this transcript that there existed in this county keen rivalry between certain community areas. It is also clear from the record that there apparently existed certain antagonisms and incompatibilities among some of the trustees and some members of the school board and the principal. This principal being the chief prosecuting witness or complaining witness against teacher. Some of the school trustees had unsuccessfully, prior to the time of the charges against the teacher, attempted to have the principal fired. It is also clear that this principal, who was the chief prosecuting witness against the teacher, had involved himself in the politics of the school trustees to the extent on one occasion of making a nomination to the board of trustees in the school where he was principal, being the same school where the teacher in this hearing functioned as a teacher.

It is further significant that there wasn't one iota of testimony concerning the moral delinquency of the teacher. It is absolutely clear from a reading of the record, and an evaluation of the testimony of all the witnesses, that the testimony completely fails to establish incompetency, insubordination, neglect of duty or immorality; nor was there any good and just cause for the cancellation of the teacher's contract. On the contrary, the weight of the testimony, and the great preponderance of the evidence, established clearly that in the person of this teacher, the students of this

school had the benefit of an intelligent, honorable, dedicated, and successful leader, who had the confidence of his students, to such an extent that classes and pupils and programs under his direction were outstandingly successful. Let Mr. Thurston L. Faulkner, a witness for the teacher, enlighten us:

Thurston L. Faulkner called as a witness in behalf of the teacher, among other things, testified that he represented the State Board of Education out of the State Department of Education as state supervisor of the Vocational Agriculture Program in Alabama, and after stating his long activity in various educational circles, stated: That for the past six years, the State Vocational Agricultural program was his direct responsibility and that he had known the teacher since 1934; that when he, the witness, was in charge of FFA activities in the State, he worked with the teacher for nine years. That he was generally familiar with the reports that were filed by the teacher, and that he was personally familiar with the teacher and his reports, which he had recently reviewed. He further stated that the teacher, involved in this hearing, is among the top men as far as capability in the State, and as far as a well-rounded FFA phase of the program, he would be in the top five, and as far as the program of vocational agriculture, he would be in the top ten in the State. He explained the alleged failure of the teacher to appear for a land judging contest held at Gurley, Alabama, under the auspices of Madison County Soil Conservation District, in substance, that such failure, if it occurred would not establish a neglect of duty on the part of the teacher. The exact words of the witness being:

"Quite often students attend these functions without their teacher present, and of course quite often neither the students nor teacher are present for these functions, but we are teaching these boys leadership and responsibility."

And that it was not the duty of the teacher to be there under vocational agriculture rules, if he were needed more at the school—having reference to the land judging contest held at Gurley, Alabama.

In testifying about the planting of shrubery and beautifying of the school grounds, which was the basis for one of the specifications against the teacher, among other things, the witness Faulkner stated, in substance:

"* * * We do feel that the agriculture teachers are trained in agriculture and landscaping and that they should work cooperatively with the principal in planning the landscape program for the school * * * it is just as much, as far as the labor is concerned, just as much a responsibility for the other teachers and other students to come out and help then [sic], you see, but when instruction ceases to be, we feel like that then is the stopping point."

He further stated that he didn't think funds could be justified for a teacher to get out and supervise a labor group.

He then testified about the Gold Emblem award. That it is given on a national basis, and that it is based on many things—it is based on having a well-rounded program. Then he was asked the ranking of the teacher involved in this hearing, and the chapter supervised by the teacher in the area of Gold Emblem awards. His answer was that "during the past two decades, or first years at Buckhorn, and Riverton Chapter, under his direction, have received more Gold Emblem awards, than any other chapter in Alabama." He was asked about in the nation, and he replied: "they are only fifth from the top in the nation, but that's pretty good. * * * There are only four chapters in the nation, out of 10,000, that are ahead of Buckhorn." He testified that there are 260 some odd chapters in the State, that is white chapters. He further testified that vocational agriculture is for boys and to his knowledge, he didn't know of any girls enrolled. He was asked if that included "calf tattooing" and he answered in the affirmative, but the respon-

sibility was only to the boys, and they had no responsibility for the girls. Here, it should be remembered that the tattooing, as the basis for one of the charges in this case, was for the tattooing of a calf exhibited by a girl.

Mr. Faulkner was then asked the question:

"You have had occasion, have you not, to observe Mr. Wigley's (teacher's) interest in the FFA and the Vocational Agriculture program?"

"A. I certain have.

"Q. What level of interest would you say he has?

"A. There is not a more devoted person to the program in Alabama, in my opinion."

On cross-examination of Mr. Faulkner, the following testimony was elicited:

"A. I said I would rate him in the top 10 per cent of our teachers in the state as having the top, best around, program.

"Q. Did you say the top five, as far as capability was concerned—top 10 per cent as far as a rounded program?

"A. I said as far as the FFA phase of it was concerned I would place him in the top five per cent, and for the entire Vocational Agriculture program I would place him in the top 10 per cent."

The record also reflects testimony as to the prizes and awards won by the chapter and persons under the direction and supervision of the teacher, and the long hours of devoted interest of the teacher to the class. It was obvious from even reading the cold written words themselves, of those testifying in behalf of the teacher, in the record and from the overwhelming testimony of the witnesses who came in from afar to rally around their former teacher, that their words in his behalf disclosed a feeling of warm devotion and respect for a dedicated man. That, in their minds he had the capacity, the character and the "knowhow" to do the job. No other conclusion could reasonably be arrived at from the preponderance of the evidence and the weight of the testimony in the record.

The record before us discloses that the following was admitted by stipulation on the hearing before the Madison County Board of Education, relating to things accomplished by pupils under the supervision of the teacher. "In 1959 the FFA Buckhorn chapter won the gold medal for chapter contest. * * * Fourth place in the quartet contest; on a state wide level; first place on farm safety contest on state wide level; honor roll, 118 members, which was the highest in the state; champion corn grower on the state level; four state farmers; won third place in the district quartet; had the champion district corn grower; was second in the county in public speaking contest; in 1960, that the Buckhorn FFA chapter had a gold medal in the chapter contest; second place at the state level in the quartet contest; first in the county in the quartet contest; won second place in farm safety contest; had 135 members, which was the highest in the state for any chapter in the state; had six state farmers; 1961, had a gold medal chapter contest; one of four; 138 members, the highest in the state; had the champion corn grower; champion district corn grower; won the MK animal health award, state, had an American farmer and state farmer; second place in the county for tractor driving contest; third place in the quartet, second place in the public speaking, and the champion district corn grower; 1962, won a gold medal in the chapter contest; won second place in quartet contest— and all these on a state level; had 157 members, which was the highest enrollment in an FFA chapter in the state; second place in farm safety contest; won one American farmer; six state farmers; was first in the county and the district in quartet contest; second in the county in public speaking."

It is further obvious, from the record, that the attorney for the teacher, upon the

original hearing before the Madison County Board of Education, was not allowed proper cross-examination. Section 359, Title 52, supra, provides that the teacher "shall have a right to cross-examine the adverse witnesses." Board of Education of Choctaw County v. Kennedy, 256 Ala. 478, 55 So.2d 511; State ex rel. Steele v. Board of Education of Fairfield, 252 Ala. 254, 40 So. 2d 689.

This appellate aspect of the tenure teacher law, that is, the State Tenure Commission, to which a review may be had of decisions of local school boards, is a covenant made by the people of Alabama with tenure school teachers, as expressed by legislative enactment—Chapter 13 and Chapter 13A, Title 52, Code of Alabama 1940. Thus, there now exists a "tenure" law and an independent appellate forum. The legislature, no doubt, felt it was necessary to have an appellate forum for tenure teachers, so that they could be removed from the heat and the aggressiveness and pressures sometimes generated in intra-community or intra-county politics. This "tenure teacher" law establishes a "means" between two extremes —the extreme of absolute local control and the other extreme of absolute freedom from any local control.

■ No forum or tribunal under existing law should have the authority, and certainly not the right, to strike down a decision of the State Tenure Commission on such evidence, or lack of affirmative evidence, as disclosed by the record in this case. It is clear that the State Tenure Commission, as it now exists, expresses the intent of the legislature to protect the right of tenure teachers, and to preserve to them a certain degree of academic freedom, and freedom from harassment that is sometimes caused by intra-community political conflict; and at the same time reserve to local authorities, through the local county school boards and local school officials, such as school trustees, school principals and school superintendents of education, proper authority within the area of their particular functioning. For the applicable statute, Title 52, §

361, as amended, supra, made the actions of the State Tenure Commission final unless unjust. It would serve no useful purpose to cite dictionary definitions and court decisions defining the word "unjust," for the courts of this State have long held the test governing administrative bodies, such as this appellate appeal board, and the principle existing in this State of established law, that when the legislature amends a statute, it approves the decisions of this court on the subject generally covered by the statute. We have several decisions of this court that discuss the principles of law covering the construction of the Teacher Tenure Act.

■ In 1941, it was held by a decision of this court, in the case of Board of Education of Marshall County v. Baugh, 240 Ala. 391, 199 So. 822, that the Teacher Tenure Act should be liberally construed in favor of teachers who constitute the class designated as primary beneficiaries of the act.

■ It is also clear that the trial court's right to review the acts of the State Tenure Commission is limited to two considerations —whether such action was taken in accordance with the requirements of the Teacher Tenure Law, and whether the action was "unjust." Title 52, § 360, Code of Alabama, 1940, as amended.

■■ Due process must be observed by all boards, as well as courts. Due process, in more ordinary language, is held to mean "fair play," as stated by the court in State ex rel. Steele v. Board of Education of Fairfield, 252 Ala. 254, 40 So.2d 689, supra. This decision is also the basis for the principle of law that in referring to insubordination, although the term is not defined by the statute, "unquestionably it includes the willful refusal of a teacher to obey the reasonable rules and regulations of his or her employing board of education." There was nothing in the record here establishing any such willful refusal.

In applying these definitions and this test to the case at hand, it is clear that the State

Tenure Commission was justified in setting aside the conclusions of the Madison County Board of Education, and that the trial court was unwarranted, from the evidence in the record, in reaching its erroneous conclusions. For the test before such court, as it affects this appeal is: Was the conclusion of the State Tenure Commission unjust? The preponderance of the evidence and the overwhelming weight of the evidence did not warrant such a conclusion.

■ In Pickens County Board of Education v. Keasler, 263 Ala. 231, 82 So.2d 197, decided by this court in 1955, among other things, it was held that the principal purpose of the Teachers' Tenure law is to secure permanency in the teaching force.

■■ In the case of Board of Education of Choctaw County v. Kennedy, 256 Ala. 478, 55 So.2d 511, supra, in referring to another section of the tenure law, relative to the word "hearing" as used in § 357, Title 52, Code of 1940, as amended, that the use of the word "hearing" shows a manifest purpose of compliance with the requirements of due process of law, and further states as follows:

"* * * 'A requirement of a hearing in the exercise of quasi-judicial powers has obvious reference to the tradition of judicial proceedings with respect to those fundamental requirements of fairness which are of the essence of due process in a proceeding of a judicial nature.' 42 Am.Jur. p. 481, § 138. 'It is the duty of the court to construe a statute so as to make it harmonize with the constitution if this can be done without doing violence to the terms of the statute and the ordinary canons of construction.' Almon v. Morgan County et al., 245 Ala. 241, 16 So.2d 511, 516. * * * In this connection in Almon v. Morgan County, et al., supra, it was aptly said: 'And so when an act confers on an administrative officer or board the power and duty to make a conclusive finding of facts which affects the substantial rights of another, when to do so requires procedural due process, * * * the court may in carrying out the intention of the legislature hold that such process was intended to be applied, * * *.'"

Here, the constitutionality of the statute was not an issue, but the requirements of due process are aptly pertinent.

In State ex rel. McIntyre v. McEachern, 231 Ala. 609, 166 So. 36, this court said:

" 'When a statute provides for the removal of an officer for cause, it contemplates notice to the officer of the charge, and requires a tribunal of some kind to determine whether the cause for removal exists and whether such officer can be removed.' * * * The Legislature prescribed that tribunal—the court of county commissioners. The finding of that tribunal may be reviewed by certiorari or mandamus (respectively when appropriate), if it is wholly 'unsupported by the evidence, or is wholly dependent upon a question of law, or is seen to be clearly arbitrary, or capricious.' * * *"

Keeping these principles in mind, we cannot escape the conclusion that here, the record discloses, the action of the trial court was clearly arbitrary.

Here, it may be that this dedicated teacher made some unintentional and honest mistakes, but the record does not support any facts that would warrant serious inpairment or destruction of him as a teacher which could result from the cancellation of his contract.

■ The instant case is clearly distinguished from the case of Cooper v. Perry County Board of Education, 264 Ala. 251, 86 So.2d 832, for in the instant case, it is clear that the friendly relations that existed throughout among members of the local board and the members of the Board of Trustees as existed in the *Cooper* case, regarding the persons involved in that "cancellation" hearing, did not exist in the case before us. *Cooper*, supra, also touches on the meaning of the term "other good and just cause," as mentioned in the statute.

*Cooper,* supra, approves of what the Supreme Court of Indiana, in Stiver v. State ex rel. Kent, 211 Ind. 380, 1 N.E.2d 1006, 1008, 7 N.E.2d 183, said in interpreting the term "other good and just cause" as used in the Teachers' Tenure Law, to include any cause which bears a reasonable relation to the teacher's fitness or capacity to discharge the duties of his position. *Cooper,* supra, in referring to the *Stiver* case, supra, stated that the Indiana court held that "lack of cooperation" is legal cause within the provision "other good and just cause." We accept such a definition, but find no lack of cooperation established to any reasonable degree by the record in the present case. For here, we hold the statutory grounds for cancellation were insufficiently supported by the evidence, to allow an affirmance of the judgment of the trial court.

As said in County Board of Education of Clarke County v. Oliver, 270 Ala. 107, 116 So.2d 566, the question for decision is "whether the judgment of the trial court is correct, not whether the ground on which the trial court professed to proceed is tenable."

The judgment of the trial court is reversed and the cause is remanded to that court with directions to rescind and set aside its peremptory writ of mandamus directed to the State Tenure Commission which writ directed that Commission to "revoke, repeal and rescind the findings that the decision of the Madison County Board of Education in revoking the contract of J. D. Wigley (the teacher) was arbitrarily unjust." The force and effect of the judgment of this court on this appeal being that the cancellation of the teacher's contract by the Madison County Board of Education was and is void.

For to hold otherwise would mean that should the trial court's judgment be allowed to stand, under the evidence as disclosed by the record on this appeal, no tenure teacher would feel that the appellate function of the State Tenure Commission was anything but a powerless, effete forum, unable to perform the duties vested in it by the legislature. Tenure school teachers are necessary and important to our schools, for like the family and the church in the community, they are helping to mold the character of today's youths—tomorrow's leaders.

Reversed and remanded with directions.

LIVINGSTON, C. J., and MERRILL, J., concur.

COLEMAN, J., concurs in result.