[No. 4759–8–III. Division Three. June 17, 1982.]

CHARLES I. STASTNY, *Appellant,* v. THE BOARD OF
TRUSTEES OF CENTRAL WASHINGTON UNIVERSITY,
*Respondent.*

*J. Kathleen Learned* and *Schroeter, Goldmark & Bender,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *Owen F. Clarke, Jr., Assistant,* for respondent.

GREEN, J.—Following a hearing, the Board of Trustees of Central Washington University terminated the employment of Associate Professor Charles I. Stastny for misconduct surrounding an unapproved absence. The Board's order was affirmed on review by the Superior Court. Professor Stastny appeals.

He questions the Board's findings and its conclusion to terminate him and raises constitutional questions concerning academic freedom, equal protection, due process, and vagueness and overbreadth of the University faculty code.

The Board, in substance, found the following facts:

In 1965 Charles Stastny was hired by Central Washington University, a state university, as an assistant professor in the Political Science Department. In 1968 he was granted tenure and promoted to the rank of associate professor. Between 1970 and 1978, he took the following approved absences from his teaching duties: (1) winter and spring quarters of academic year 1969–70, on leave without pay; (2) winter quarter, 1971–72 academic year, on leave without pay while teaching at Elmira College; (3) the entire 1973–74 academic year, sabbatical leave; (4) on approved leave while attending two meetings, one in Toronto, the other in Chicago, in November 1975; (5) February of 1976 through spring quarter of the academic year, on medical and then disability leave for convalescence;[1] (6) he requested to be excused from his 1978 summer teaching contract, shortly before the session commenced, to receive a grant to work at Harvard University. Approval was granted "with prejudice".

---

[1]The Board's findings incorrectly state this occurred beginning in February 1975 and through spring quarter of the 1974–75 academic year. The record indicates the leave occurred in 1976. See exhibits S–32 through S–42.

Professor Stastny also had several unapproved leaves of absence: (1) in January 1973 he returned 2 days late from a trip to India; (2) in November 1974 he returned late from a trip to Mexico and during the same month failed to return from Chicago at the time specified; (3) in November 1975 he canceled a class without authorization; (4) in January 1977 he was 1 day late in starting the quarter and arranged by telephone for Professor Odell to handle his registration duties; (5) in October 1978 he canceled a class without authorization and absented himself from the campus.

The Board found that because of the unapproved absences, Professor Stastny had been disciplined by docking his pay and his departmental colleagues voted to censure him. The censure was later removed from his file. Dean Williams also counseled him about his tardiness.

As a prelude to the incident precipitating his dismissal, the record indicates Professor Stastny's classes for the summer of 1979 had been canceled to allow him to be at Harvard University to work on a book he was writing in collaboration with another person. He also made inquiry about a possible absence during spring quarter 1979 to attend a Canadian Studies Faculty Enrichment Program in Toronto.

On November 15, 1978, Professor Stastny informed Dean Williams and Department Chairman Yee by letter he was to receive an invitation to deliver a lecture at a seminar in Jerusalem on January 8 or 9, 1979, and indicated the method of class coverage in his absence.[2] On December 5 Professor Stastny formally requested approval of this absence for four class days. The record shows he would miss eight classes plus advisory duties during registration of students at the beginning of winter quarter. On December 6 Chairman Yee authorized Professor Stastny to be absent from January 2 until noon on January 8, thus permitting an

---

[2]The record shows that shortly after writing this letter and before a formal request was submitted or the anticipated absence approved, he booked airlines reservations for departure on December 25 with return on January 9.

absence from two days' registration and two class days. On December 7, Professor Stastny responded stating he was "locked in" to his travel plans and could not change them; he again requested approval of his proposed absence from January 2 to January 9 at 10 a.m.

The dispute was then referred to Dean Williams who reviewed the absence history of Professor Stastny and on December 8 informed him in writing that his request to return late to his campus obligations was denied. On December 18 Professor Stastny requested University President Garrity to conciliate the matter. On December 20 after a discussion between President Garrity, Vice–President Harrington and himself and with the president's approval, Dean Williams notified Professor Stastny in writing that the denial of his request was affirmed and directed him to fulfill his duties as scheduled for winter quarter 1979. The letter also stated, "If you choose to abridge or ignore this directive, I shall institute appropriate disciplinary measures."

On December 22 Professor Stastny again requested intervention by President Garrity and indicated his intention to institute grievance procedures if his planned absence was not approved. Before receiving a response, on December 25 he left for Israel. By letter to Dean Williams, datelined Jerusalem, he confirmed his presence in Jerusalem and stated he would proceed on his own plan of returning to the University the night of January 9. On January 4, 1979, President Garrity wrote Professor Stastny requesting he meet with Dean Williams, Chairman Yee, Vice–President Harrington and with him.

Professor Stastny returned January 10. Meanwhile, Chairman Yee, with approval of Dean Williams, had canceled the professor's scheduled classes for winter quarter. On January 15 President Garrity, Dean Williams, Chairman Yee and Vice–President Harrington met with Professor Stastny and offered him the opportunity to explain his unauthorized absence. On January 25 President Garrity informed Professor Stastny he would recommend to the

Board of Trustees that the professor be dismissed from the faculty for insubordination, grievous and willful violation of published university rules, and gross misconduct.

The Board also found that the Political Science Department consists of 3.5 full–time professors and, as a result, it is difficult to offer a wide variety of political science courses. There had been an attempt to upgrade the courses offered, and this has been hampered to a degree by the absences of Professor Stastny. Further, it was found the professor had been absent in either an approved or unapproved status more than other professors in the same department. Additionally, the first several days of each quarter were found critical for appropriately conducting a class for the remainder of the quarter. The requested date for Professor Stastny's return from Israel would have been after the date students could add or drop his class, the inference being the students' decision would have to be made without Professor Stastny's presence. The Board noted that Professor Stastny's relationship with his colleagues in his department was strained over the years, and they all recommended his discharge.

The Board concluded it had been shown by clear and convincing evidence that Professor Stastny had been "insubordinate" by his unapproved absence after being forewarned that disciplinary steps would be taken; he had willfully and deliberately violated published institutional and related board rules and regulations which had a harmful impact on the department and its students, particularly in light of the limited resources of that department; and his misconduct evidences a substantial disregard of the interests of the university, students and faculty colleagues. The Board also stated the professor's prior approved absences should only be considered in determining whether the administration was fair in its disapproval of the proposed absence. It concluded the denial of the approved absence was not arbitrary, discriminatory or unreasonable nor was there any violation of the constitutional right to free speech or academic freedom in the disapproval of Professor

Stastny's request. Accordingly, the Board ordered termination of his employment.

 Since the University is an institution of higher education, RCW 28B.19.020(1), our review is governed by the State Higher Education Administrative Procedure Act, RCW 28B.19.150(6), the provisions of which are identical to the administrative procedure act, RCW 34.04.130. The scope of

> our review of administrative decisions is on the record of the administrative tribunal itself, not of the superior court. . . .
>
> . . .
> . . . Substitution of our judgment for that of the administrative agency in factual matters is not authorized by the APA, and by reasoning of *Hesperian Orchards* [*Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959)], we will not try facts de novo on review.

*Franklin Cy. Sheriff's Office v. Sellers,* 97 Wn.2d 317, 323–25, 646 P.2d 113 (1982).

First, Professor Stastny contends a professor can only be dismissed for adequate cause related directly and substantially to his performance as a teacher, and here the Board of Trustees did not find the conduct which constituted the offense with which Professor Stastny was charged had a substantial and direct adverse effect on his performance.

 A review of the faculty code reveals two sections pertinent to Professor Stastny's dismissal. Sections 3.72(A) and 3.90(A).[3] Section 3.72(A) provides a tenured faculty member may be terminated "only for sufficient cause" and specifies insubordination, gross misconduct, willful viola-

---

[3]Section 3.72(A) provides: "Sufficient cause for termination shall be: (1) Insubordination; or . . . (5) Grievous or willful violation of published institutional and related board rules and regulations; or . . . (10) Gross misconduct . . ." Section 3.90(A) provides: "Dismissal shall be for adequate cause only and shall accord with the following procedures: (1) Adequate cause for dismissal shall be related directly and substantially to the fitness and performance of the faculty member in his professional capacity. Dismissal for cause shall not be used to restrain faculty members in their exercise of academic freedom or other rights as U.S. citizens; . . ."

tion of rules and regulations as sufficient causes. Section 3.90(A)(1) provides: "Adequate cause for dismissal shall be related directly and substantially to the fitness and performance of the faculty member in his professional capacity." Thus, whenever a professor is dismissed, a material factual issue is presented as to whether the professor's conduct affected his fitness and performance as a teacher. *See Hoagland v. Mount Vernon Sch. Dist. 320,* 95 Wn.2d 424, 426–28, 623 P.2d 1156 (1981).

Although denominated conclusions of law, the Board found the following ultimate facts:

II

It was shown by clear and convincing evidence that Professor Stastny was "insubordinate" in being absent from his assigned campus responsibilities for the first six working days of Winter Quarter, 1979, after his request to be absent was specifically denied by his Dean and he was warned that if he chose not to be present, that disciplinary steps would be taken.

III

It was shown by clear and convincing evidence that Professor Stastny willfully; that is, deliberately, violated "published institutional and related board rules and regulations," including sections 2.43c and 2.124 of the Faculty Code.

IV

It was shown by clear and convincing evidence that the violation of the related Board rules and regulations, including sections 2.43c and 2.124 of the Faculty Code, by the petitioner was grievous in its harmful impact on the Political Science Department and its students, particular[ly] in light of the limited resources of that department.

V

It was shown by clear and convincing evidence that Professor Stastny had engaged in gross misconduct; that is, misconduct which evidences substantial disregard of the interests of the University students and faculty colleagues.

How the trial court labels the finding or conclusion is not determinative; this court will treat it for what it really is.

*Ridgeview Properties v. Starbuck,* 96 Wn.2d 716, 719, 638 P.2d 1231 (1982); *State v. Williams,* 96 Wn.2d 215, 220–21, 634 P.2d 868 (1981). These findings of ultimate facts along with the other findings of the Board establish the grounds for the Board's conclusion there was "sufficient cause for termination", and Professor Stastny's conduct impacted his performance as a teacher. After a thorough review of the administrative record in light of the standards for review recently announced in *Franklin Cy. Sheriff's Office v. Sellers, supra* at 324–25, we cannot say the findings of fact entered by the Board are clearly erroneous.

Second, Professor Stastny contends his single act of disobedience in absenting himself from his assigned faculty duties, contrary to an express denial of permission to do so, was for the purpose of testing the administration's decision and did not constitute insubordination. He argues insubordination refers to a general course of disobedient or mutinous conduct, not a "single respectful act of disobedience".

"Insubordination" has been defined as the willful refusal of a teacher to obey the reasonable rules and regulations of the board of education, Annot., *What Constitutes "Insubordination" as Grounds for Dismissal of Public School Teacher,* 78 A.L.R.3d 83, § 3 at 90 (1977); *State Tenure Comm'n v. Madison Cy. Bd. of Educ.,* 282 Ala. 658, 213 So. 2d 823 (1968); *State ex rel. Steele v. Board of Educ.,* 252 Ala. 254, 40 So. 2d 689 (1949); *Board of Educ. v. Swan,* 41 Cal. 2d 546, 261 P.2d 261 (1953), *cert. denied,* 347 U.S. 937, 98 L. Ed. 1087, 74 S. Ct. 627 (1954), or disobedience of orders, or direction, with a general disaffected attitude toward authority. *Coleman v. State,* 189 So. 2d 415 (Fla. Dist. Ct. App. 1966); *State ex rel. Richardson v. Board of Regents,* 70 Nev. 347, 269 P.2d 265 (1954). Insubordination may consist of a persistent course of willful defiance in refusing to obey a reasonable direct or implied order given by proper authority. *Board of Trustees v. Colwell,* 611 P.2d 427 (Wyo. 1980); *Ray v. Minneapolis Bd. of Educ.,* 295 Minn. 13, 202 N.W.2d 375 (1972). In those cases where insubordination was charged due to an absence by

the teacher and the teacher had notified the proper authorities of the proposed absence and approval of such was expressly denied, the dismissals for insubordination were affirmed. *See Fernald v. Ellsworth Superintending Sch. Comm.*, 342 A.2d 704, 78 A.L.R.3d 108 (Me. 1975); *Johnson v. United Sch. Dist. Joint Sch. Bd.*, 201 Pa. Super. 375, 191 A.2d 897 (1963).

Here Professor Stastny's conduct was insubordinate. It was persistent in that even though he received two letters denying approval of his requested absence and directing him to be present and carry out his assigned duties during the winter quarter, he went on his trip as he had planned. His conduct was willful. The final letter of denial warned him that if he ignored the directive, disciplinary measures would be instituted. This meant possible termination. Faculty code § 3.56(A), *infra*. Notwithstanding this warning, he defied it and went to Israel, absenting himself from his duties contrary to the express directive of the University. His general attitude was expressed in a letter to Dean Williams on December 8, 1978:

> I must insist that it is my classroom and it is I who will meet my class responsibilities. So what are we running here? A University or a military prep school? Since when is the "I hereby direct" mode of discourse deemed appropriate at the university level?

In light of the extensive absences previously approved by the University, the disapproval in this instance was not unreasonable. The Board's findings support the conclusion Professor Stastny was insubordinate and his contention must be rejected.

Third, Professor Stastny contends the Board of Trustees acted in excess of its jurisdiction and without statutory authority when it based its dismissal of him on the individual recommendations of his departmental colleagues. He argues the recommendations were based on irrelevant and prejudicial considerations and his colleagues were not qualified as expert witnesses to give their opinions as to whether he should be dismissed.

■■ We need not consider this argument for two reasons: (1) While Professor Stastny's counsel objected to the admission of the other professors' recommendations regarding the sanction to be imposed, he withdrew his objection. Failure to object or take exception at the trial level bars raising an issue for the first time on appeal. *State v. Theroff*, 95 Wn.2d 385, 391, 622 P.2d 1240 (1980); *State v. Ermert*, 94 Wn.2d 839, 848, 621 P.2d 121 (1980). (2) No relevant authority is cited in support of Professor Stastny's argument; therefore, it need not be considered. *State v. Fortun*, 94 Wn.2d 754, 756, 626 P.2d 504 (1980). Moreover, his departmental colleagues' testimony was only one of many considerations underlying the Board's decision.

Fourth, Professor Stastny contends the University, by dismissing him, violated his right to academic freedom and freedom of expression; and, the University had no compelling interest in denying him the brief absence.

■ Although academic freedom is not one of the enumerated rights of the First Amendment, the right to teach, inquire, evaluate and study is fundamental to a democratic society. *Widmar v. Vincent*, 454 U.S. 263, 70 L. Ed. 2d 440, 451–52, 102 S. Ct. 269 (1981); *Keyishian v. Board of Regents*, 385 U.S. 589, 17 L. Ed. 2d 629, 87 S. Ct. 675 (1967); *Sweezy v. New Hampshire*, 354 U.S. 234, 250, 1 L. Ed. 2d 1311, 77 S. Ct. 1203 (1957). The safeguards of the First Amendment will be quickly brought into play to protect the right of academic freedom because an unwarranted invasion of such right will tend to have a chilling effect on the exercise of the right by other teachers. *Wieman v. Updegraff*, 344 U.S. 183, 194–95, 97 L. Ed. 216, 73 S. Ct. 215 (1952). Academic freedom is therefore a special concern of the First Amendment. *Keyishian v. Board of Regents, supra* at 603; *Cary v. Board of Educ.*, 598 F.2d 535 (10th Cir. 1979). However, "[i]t does not follow that because academic freedom is inextricably related to the educational process it is implicated in every employment decision of an educational institution." *Kunda v. Muhlenberg College*, 621 F.2d 532, 547 (3d Cir. 1980). Academic freedom is not a

license for activity at variance with job related procedures and requirements, nor does it encompass activities which are internally destructive to the proper function of the university or disruptive to the education process. *See Pickering v. Board of Educ.,* 391 U.S. 563, 572, 20 L. Ed. 2d 811, 88 S. Ct. 1731 (1968); *Roseman v. Indiana Univ.,* 520 F.2d 1364 (3d Cir. 1975), *cert. denied,* 424 U.S. 921, 47 L. Ed. 2d 329, 96 S. Ct. 1128 (1976); *Clark v. Holmes,* 474 F.2d 928, 931 (7th Cir. 1972); *Keddie v. Pennsylvania State Univ.,* 412 F. Supp. 1264, 1270 (M.D. Pa. 1976). Teachers may not leave their classrooms unattended in order to exercise the right of free expression, as schools and classes cannot be conducted without someone being in charge. *Graves v. Walton Cy. Bd. of Educ.,* 300 F. Supp. 188, 194 (M.D. Ga. 1968), *aff'd,* 410 F.2d 1153 (5th Cir. 1969).

The denial of Professor Stastny's trip to Israel was not grounded in any infringement of his right to free speech. Rather, it was grounded in his responsibility to the students and the University. The Board found that the first few days of a quarter were critical to the remainder of the quarter. Professor Stastny had obligations relative to registration and to aiding students in their decision to add or drop his class. Academic freedom does not mean freedom from academic responsibility to students, colleagues and the orderly administration of the University. It is apparent from the Board's findings the denial of Professor Stastny's request was reasonable, in light of the repeated liberal grants of absences, and did not impair his right to academic freedom.

Professor Stastny also argues the University must show a compelling state interest before it could deny his request for absence and later dismiss him. The right of academic freedom, like all other constitutional rights, is not an absolute. *Moore v. Gaston Cy. Bd. of Educ.,* 357 F. Supp. 1037, 1040 (W.D.N.C. 1973). There must be a weighing of the respective interests involved. *Konigsberg v. State Bar,* 366 U.S. 36, 51, 6 L. Ed. 2d 105, 81 S. Ct. 997 (1961). It has been said that First Amendment rights of teachers must be

balanced with those of the State in assuring "orderly school administration". *Pickering v. Board of Educ., supra.* State interests may limit the right of a university professor to say and do as he pleases. *Keddie v. Pennsylvania State Univ., supra* at 1270. For example: (1) The need to maintain harmony among coworkers; (2) the need to curtail conduct impeding the teacher's proper and competent performance of his daily duties; (3) the need to prevent activities disruptive of the educational process and to provide for the orderly functioning of the university. *See Roseman v. Indiana Univ., supra; Hetrick v. Martin,* 480 F.2d 705 (6th Cir. 1973); *Simard v. Board of Educ.,* 473 F.2d 988 (2d Cir. 1973); *Clark v. Holmes, supra* at 931–32; *Knarr v. Board of Sch. Trustees,* 317 F. Supp. 832 (N.D. Ind. 1970), *aff'd,* 452 F.2d 649 (7th Cir. 1971); *Johnson v. Branch,* 364 F.2d 177 (4th Cir. 1966); *Robbins v. Board of Educ.,* 313 F. Supp. 642, 645, 647 (N.D. Ill. 1970); *Keddie v. Pennsylvania State Univ., supra* at 1271. It is apparent from the Board's findings and conclusions the University did show compelling interests and Professor Stastny's argument is not meritorious.

Fifth, Professor Stastny contends the evidence shows his right to equal protection was violated because the university rules were applied to him in a discriminatory fashion when he was denied a brief absence to present his research findings at another university.

The purpose of the equal protection clause of the Fourteenth Amendment is to secure equality of treatment to all without undue favor or discrimination. Discrimination by state officials in the administration of the law may violate the equal protection clause. *Yick Wo v. Hopkins,* 118 U.S. 356, 30 L. Ed. 220, 6 S. Ct. 1064 (1886). However,

> [t]he administration by state officers of a state statute which is fair on its face but which results in an unequal application of the law to citizens is not a denial of equal protection unless there is shown *to be present an element of intentional or purposeful discrimination.* A discriminatory purpose must be shown clearly by one

claiming discrimination since such a purpose cannot be presumed.

(Italics ours.) *State v. Nixon,* 10 Wn. App. 355, 358, 517 P.2d 212 (1973), *review denied,* 83 Wn.2d 1014 (1974); *see also Snowden v. Hughes,* 321 U.S. 1, 88 L. Ed. 497, 64 S. Ct. 397 (1944).

While Professor Stastny presented some evidence of possible unequal application of leave of absence policies, there is no evidence of intentional or purposeful discrimination in the application of those policies. On the other hand, the University presented evidence: other professors had been denied permission for requested absences; the policy in other departments was never to approve absences which would occur during the first week or 10 days of a new academic quarter; and testimony of Professor Stastny's colleagues that in their opinion he had not been treated unfairly or differently from others. Professor Stastny has failed to carry his burden of proving intentional and purposeful discrimination and this contention must fail.

Sixth, Professor Stastny contends the provisions of section 3.72(A) of the faculty code which were the basis of his dismissal—insubordination, grievous or willful violation of institutional rules and regulations, and gross misconduct—suffer from the twin constitutional vices of vagueness and overbreadth. He argues they are vague because they do not provide sufficient notice of what they permit and what they prohibit, nor do they contain reasonably clear guidelines so as to prevent official arbitrariness and discrimination in their enforcement. We disagree.

The concept of unconstitutional vagueness means no prohibition can stand or penalty attach where an individual could not reasonably understand his contemplated conduct is proscribed. *Grant Cy. v. Bohne,* 89 Wn.2d 953, 955, 577 P.2d 138 (1978); *United States v. National Dairy Prods. Corp.,* 372 U.S. 29, 32–33, 9 L. Ed. 2d 561, 83 S. Ct. 594 (1963). Any statute, including a rule or regulation of an administrative agency, which forbids an act in terms so vague persons of common intelligence must necessarily

guess at its meaning and differ as to its application, violates the first essential of due process of law. *Broadrick v. Oklahoma,* 413 U.S. 601, 607, 37 L. Ed. 2d 830, 93 S. Ct. 2908 (1973); *Coates v. Cincinnati,* 402 U.S. 611, 614, 29 L. Ed. 2d 214, 91 S. Ct. 1686 (1971); *Baggett v. Bullitt,* 377 U.S. 360, 367, 12 L. Ed. 2d 377, 84 S. Ct. 1316 (1964); *Cramp v. Board of Pub. Instruction,* 368 U.S. 278, 287, 7 L. Ed. 2d 285, 82 S. Ct. 275 (1961); *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 70 L. Ed. 322, 46 S. Ct. 126 (1926); *Bellevue v. Miller,* 85 Wn.2d 539, 536 P.2d 603 (1975). This principle requires the statute provide explicit standards to prevent arbitrary and discriminatory enforcement. *Seattle v. Rice,* 93 Wn.2d 728, 731, 612 P.2d 792 (1980); *State v. Rhodes,* 92 Wn.2d 755, 758–59, 600 P.2d 1264 (1979). When First Amendment rights are involved, a greater degree of specificity is required. *Buckley v. Valeo,* 424 U.S. 1, 77, 46 L. Ed. 2d 659, 96 S. Ct. 612 (1976); *Cramp v. Board of Pub. Instruction,* 368 U.S. at 287; *Keyishian v. Board of Regents,* 385 U.S. at 604.

When construing an undefined term in the statute, or an administrative agency rule, it is reasonable to give the term its ordinary, common, everyday meaning. *Gaylord v. Tacoma Sch. Dist. 10,* 88 Wn.2d 286, 291, 559 P.2d 1340 (1977); *New York Life Ins. Co. v. Jones,* 86 Wn.2d 44, 47, 541 P.2d 989 (1975). In addition to the judicial definition of insubordination given earlier in this opinion, the general ordinary meaning of insubordination is defiance or disobedience to authority and the refusal to obey orders. *Webster's Third New International Dictionary* 1172 (3d ed. 1969); 5 *Oxford English Dictionary* I–358 (1970). Here, after proper authorities repeatedly denied Professor Stastny's request for approval of his proposed absence to Israel and warned of disciplinary action if he did go, he went anyway. He cannot now claim the word "insubordination", as used in the faculty code, section 3.72(A), is so vague he could not reasonably understand his contemplated conduct would be "insubordination" which was a ground for dismissal under the code.

The term "misconduct" contained in the faculty code as a ground for termination has been held to be neither unconstitutionally vague nor overbroad. *Arnett v. Kennedy,* 416 U.S. 134, 161–62, 40 L. Ed. 2d 15, 94 S. Ct. 1633 (1974); *Gilbertson v. McAlister,* 403 F. Supp. 1, 8 (D. Conn. 1975). Also, it is clear without further discussion that the phraseology "violation of rules and regulations" used in the code is not so vague that persons of common intelligence must guess at its meaning and differ as to its application. Moreover, it has been held that even if a term (such as "immorality") used as a ground for discharge of a teacher is unconstitutionally vague by itself, if it is coupled with resulting actual or prospective adverse performance of the teacher, it is no longer considered vague. *Gaylord v. Tacoma Sch. Dist. 10, supra* at 290. Here faculty code section 3.90 requires all causes for termination be related to the faculty member's performance.

Further, Professor Stastny argues the doctrine of overbreadth applies because *the faculty code provisions are capable of limiting activity, outside the facts of this case,* protected by the First Amendment. Consequently, he asserts standing to challenge the code for the benefit of other faculty members. He also contends the University relied upon activity that occurred before he left for Israel, consisting of the letters he wrote to Chairman Yee, Dean Williams and President Garrity—communications obviously protected by the First Amendment.

 "Overbreadth" addresses the question of substantive due process, *i.e.,* whether the statute is so broad it may not only prohibit unprotected behavior, but also constitutionally protected activity as well. *Grayned v. Rockford,* 408 U.S. 104, 114, 33 L. Ed. 2d 222, 92 S. Ct. 2294 (1972); *United States v. Robel,* 389 U.S. 258, 19 L. Ed. 2d 508, 88 S. Ct. 419 (1967); *Blondheim v. State,* 84 Wn.2d 874, 878, 529 P.2d 1096 (1975). Where pure speech is involved, the traditional rules of standing have been altered to allow attacks on overly broad statutes without requiring the person making the attack to demonstrate his own rights of free

expression have been violated. *Broadrick v. Oklahoma,* 413 U.S. at 612; *Gooding v. Wilson,* 405 U.S. 518, 521, 31 L. Ed. 2d 408, 92 S. Ct. 1103 (1972). However, where more than pure speech is involved, a person does not have standing to challenge a statute on the basis of overbreadth for the benefit of others. *Broadrick v. Oklahoma, supra* at 612.

Here, contrary to Professor Stastny's position, the Board's findings and conclusions clearly state Professor Stastny's unauthorized absence from his assigned campus responsibilities was the reason for his dismissal. No mention is made of letters. This unapproved absence was conduct, not speech, therefore Professor Stastny has no standing to challenge the faculty code provisions for overbreadth for the alleged benefit of others.

Furthermore, faculty code section 3.90(A)(1) by its terms limits the dismissal provisions, claimed by Professor Stastny to be overbroad, stating:

> Dismissal for cause shall not be used to restrain faculty members in their exercise of academic freedom or other rights as U.S. citizens: . . .

Finally, Professor Stastny contends his dismissal was an excessive penalty and therefore was a denial of substantive due process.

He argues his dismissal was an excessive penalty because it was the first formal disciplinary action taken against him and the punishment was not commensurate with the offenses alleged and the faculty code provides a series of lesser sanctions. Contrary to this assertion, the evidence shows and the Board found Professor Stastny had been subject to disciplinary measures in the past for conduct similar to that for which he was dismissed. The findings of the Board indicate that the lesser sanctions contained in the faculty code,[4] *i.e.,* warning, censure and written reprimand, which

---

[4]Faculty code § 3.56(A) provides: "[A]dministrative sanctions available to be applied in instances of violation are: (1) Warning—written notice to the faculty member that he is in violation and that continued or additional conduct of similar character may lead to more severe action. (2) Censure—written reprimand that a serious violation has occurred. . . . (3) Change in assignment. (4) Suspension

Professor Stastny contends should have been used, had been used in the past. Professor Stastny's conduct indicated warnings and written expressions of disapproval by his colleagues, the dean, department chairman and president of the University, and "docking" of pay, had not influenced him to change his behavior. President Garrity testified:

> I felt that this sanction . . . of dismissal, was appropriate because this pattern of conduct had reached a point which clearly Dr. Stastny had attempted to pit himself against the university. And it seemed to me that we had reached a point where we had to fish or cut bait;

He argues that when a person with innocent motives believes a law is unconstitutional in that it acts as a censure or prior restraint upon the exercise of First Amendment rights, he may ignore it and exercise his rights. However, this rule is limited to laws infringing on First Amendment rights. *Shuttlesworth v. Birmingham,* 394 U.S. 147, 151, 22 L. Ed. 2d 162, 89 S. Ct. 935 (1969). Here the University did not impose any prior restraint or censure upon Professor Stastny's research or teaching so as to infringe on his First Amendment rights, but rather merely curtailed the time he could be away from his assigned campus duties.

Professor Stastny's contention his dismissal violates due process in that it offends a sense of justice and "shocks the conscience" is without merit. He relies on *Rochin v. California,* 342 U.S. 165, 96 L. Ed. 183, 72 S. Ct. 205, 25 A.L.R.2d 1396 (1952), a criminal case in which the court found the extraction of evidence from an accused's stomach against his will offends a "sense of justice" and "shocks the conscience", and therefore was a constitutional

---

without pay for a stated period of time. (5) Termination or dismissal . . . (D) Disciplinary action or the threat of dismissal shall not be used to restrain faculty members in their exercise of academic freedom or other rights. However, 'academic freedom' does not include the right to remain a faculty member while persistently refusing to perform one's proper functions as a faculty member or the right to violate university rules and regulations."

violation of due process. This constitutional "shock the conscience" test has not been applied in a civil case and none has been cited to us. Furthermore, the "shock the conscience" phraseology used in *Harris v. Mechanicville Cent. Sch. Dist.,* 45 N.Y.2d 279, 380 N.E.2d 213, 408 N.Y.S.2d 384 (1978), cited by Professor Stastny did not involve a constitutional due process test; rather it involved a standard of review of administratively imposed sanctions in New York State decided on nonconstitutional grounds. *Harris v. Mechanicville Cent. Sch. Dist., supra,* 380 N.E.2d at 215–16.

Also, Professor Stastny's reliance on *Wojt v. Chimacum Sch. Dist. 49,* 9 Wn. App. 857, 516 P.2d 1099 (1973), is misplaced because it involves procedural due process and probationary periods for teachers rather than substantive due process principles. In that case, the acts and comments of the teacher were held to be remedial deficiencies capable of solution. *Wojt v. Chimacum Sch. Dist. 49, supra* at 863. Moreover, the court stated: "Should the required procedure fail of substantial correction of work–related deficiencies, the power of the school board to discharge therefor remains unimpaired." *Wojt v. Chimacum Sch. Dist. 49, supra* at 864.

The findings, conclusions and decision of the Board of Trustees are supported by the record. *Franklin Cy. Sheriff's Office v. Sellers,* 97 Wn.2d 317, 646 P.2d 113 (1982). Its decision dismissing Professor Stastny from the faculty of Central Washington University must be affirmed.

McINTURFF, C.J., and ROE, J., concur.

Reconsideration denied July 16, 1982.

Review denied by Supreme Court November 8, 1982.