260

[No. 62402-4-I.   Division One.   May 26, 2009.]

PERRY MILLS, *Appellant*, v. WESTERN WASHINGTON UNIVERSITY, *Respondent.*

*James E. Lobsenz* (of *Carney Badley Spellman*), for appellant.

*Robert M. McKenna, Attorney General*, and *Wendy K. Bohlke, Senior Counsel*, for respondent.

¶1 Dwyer, A.C.J. — Perry Mills is a tenured theatre professor at Western Washington University (University), a state educational institution. In response to numerous complaints by students, staff, and other faculty members about his verbally abusive behavior, the University brought

disciplinary charges against Mills, which were adjudicated at an administrative hearing. Over Mills's objection, the hearing was closed to the public and the press. Ultimately, the University suspended Mills for two academic quarters without pay. He brought this challenge to the suspension pursuant to the state Administrative Procedure Act.[1] The superior court denied relief. On appeal, Mills contends that (1) the University's actions violated his employment contract, (2) the Faculty Code of Ethics—his violation of which provided the basis for his suspension—is unconstitutionally vague, (3) his suspension violated his constitutional free speech rights, and (4) the hearing closure was unlawful. We hold that the University did not violate Mills's employment contract, that the Faculty Code of Ethics is not unconstitutionally vague, and that the University did not violate Mills's free speech rights. However, we also hold that the University violated the Administrative Procedure Act by conducting Mills's disciplinary hearing in secret. Accordingly, we vacate the University's final order and remand to the University for a new hearing.

I

¶2 Mills has taught in the University's Theatre Arts department for more than 20 years.[2] He received tenure in 1994. Final Order at 2. Soon thereafter, complaints about his conduct began surfacing.

¶3 In 1998-99, Mills was denied promotion to the rank of full professor. The Theatre Arts department chair at the time recommended against the promotion, citing behavior by Mills including "using foul language with and toward students, employing a combative teaching style, discussing

---

[1] Ch. 34.05 RCW.

[2] The facts stated are adapted from the findings of fact of the University's Board of Trustees' review decision and final order. Mills has not assigned error to the board's findings. Accordingly, they are treated as verities on appeal. *Tapper v. Employment Sec. Dep't*, 122 Wn.2d 397, 407, 858 P.2d 494 (1993). For convenience, citations are to this "Final Order."

other faculty members with students in a derogatory and demeaning manner, enjoying his wit at the expense of students, . . . berating and demeaning students in the guise of humor," causing "an extremely high student complaint rate," and "berating and demeaning colleagues in the guise of humor." Final Order at 21.

¶4 In 2000, new department chair Mark Kuntz admonished Mills for making demeaning comments toward and about women, gay students, and minorities. Final Order at 21. Slightly less than a year later, Kuntz again formally admonished Mills, stating, "Your repeated need to express your desire to 'kill' people is not appropriate, and will stop . . . . Your lack of sensitivity or care about the needs of students, staff, and colleagues must stop." Final Order at 21.

¶5 That same year, in response to student complaints, Kuntz admonished Mills for brandishing a knife in class. Final Order at 15. Less than a year later, members of the department's faculty and staff wrote a letter to the dean of the department's college expressing their " 'real and tangible fear' occasioned by Mills's carrying of a registered firearm and a large knife on campus and in the classroom, together with his belligerent rants about killing people who offended him." The dean admonished Mills in response to this complaint. Final Order at 15.

¶6 These communications had little, if any, effect on Mills's behavior. On the first day that a new professor, Deborah Geer Currier, commenced working in the department in the fall of 2001, Mills told her that "she had better keep her legs closed, because she could not be expected to teach students the same way she got her doctorate." Final Order at 5. Mills repeatedly called her, in the workplace and to her face, "bimbo," "slut," and, on one occasion, "cunt." Currier took Mills's abuse in silence until she secured a tenure-track position. She then informed Mills that she would not tolerate further sexual innuendo directed at her, and Mills ceased verbally abusing her to her face. Final Order at 5.

¶7 During a conversation with another faculty member, Gregory Pulver, who was in his first year of employment with the department, Mills referred to him as "just a stupid faggot." Pulver informed Mills that his behavior was unacceptable. Again, Mills ceased insulting Pulver to his face. Instead, he began referring to Pulver behind his back as "Precious" in a lilting manner that mocked Pulver's sexual orientation, both to students and to colleagues. According to Pulver, he felt unsafe around Mills and avoided him whenever possible. Final Order at 6-7.

¶8 Mills did not limit his verbal abuse to other faculty members. For years, Mills called the department's administrative assistant, Kay Redell, a variety of derogatory names. For example, he was overheard telling her, "You're just a stupid bitch. You're just white trailer trash." Final Order at 7. Both Currier and Pulver stated that they frequently observed Redell to be "incredibly upset," "distraught," and "shaken" following such exchanges with Mills. Final Order at 7.

¶9 Mills also verbally abused students. For instance, inside the classroom, he referred to students (mostly female) as "shit for brains," "blondies," and "fucking lazy girl[s]." On one occasion, he referred to an overweight female student as "a 400-pound canary who warbles nothingness" and "makes him sick." Final Order at 16. Outside the classroom, Kuntz once overheard Mills berating a student library assistant, screaming, "You bitch, you screwed up," and, to her supervisor, "Is she retarded?" Final Order at 17.

¶10 Both Currier and Pulver stated that it was common for students to come to them in tears due to verbal abuse by Mills. Because of Mills's seniority in the department, Pulver limited himself to recommending that gay students "sit in the back and keep quiet," and request waivers from Mills's courses. Pulver found it "nauseating" to have to give students such advice. Final Order at 16.

¶11 In 2004, Mills again displayed a knife in class, drawing an official complaint from a student who felt unsafe in his presence. Final Order at 14.

¶12 That same year, a student who had been undergoing treatment for cancer enrolled in Mills's dramatic writing class, a requirement for her major. When the class began, she was not yet fully recovered and was still bald from chemotherapy. In response to a request from Mills, she initially volunteered to "put up" a play for criticism, but then became reticent. Mills responded, "if you can't even put up your piece for class then you should have just died of cancer." According to Mills, he was attempting "to motivate her to consider that art is worth putting yourself out for, and if we don't produce art, it's just as if we never had existed." The student viewed the remark otherwise, and filed a complaint against Mills with Carol Edwards, the new dean of the department's college. Final Order at 12, 20.

¶13 Currier and Pulver also filed formal complaints with Edwards that year. Based on these complaints and a review of Mills's personnel file, Edwards brought the matter to the University provost, who suspended Mills with full pay "pending an investigation of [the] complaints." Final Order at 2. The provost also arranged a meeting between Mills and University officials "to review and discuss the complaints." Final Order at 2. After the meeting, the provost declined to reinstate Mills's teaching duties. Final Order at 2.

¶14 The provost then requested that the Faculty Senate appoint three members of the Standing Committee on Grievances and Sanctions and "attempt to 'effect an adjustment.'" Following the failure of these negotiations, the provost issued a formal statement of charges against Mills. Final Order at 3.

¶15 The provost alleged that Mills had violated section 1 of the Faculty Code of Ethics by failing in his "obligation to exercise self-discipline and judgment in using, extending and transmitting knowledge," that Mills had violated section two's requirement that faculty members

"encourage the free pursuit of learning by students" and "avoid and condemn sexual harassment, intimidation, and the exploitation of students," and that Mills had violated section 4's requirement that faculty members conduct themselves in a manner expressing "respect for, and defense of, the free inquiry of associates and, in the exchange of criticism and ideas, the respect for the opinions of others."

¶16 The University then convened a hearing panel of five faculty members and a nonvoting presiding officer. Final Order at 3. Citing procedures in the University's Faculty Handbook,[3] and over the objections of both Mills and a newspaper reporter, the hearing was conducted in secret.

¶17 The hearing panel recommended that Mills be suspended without pay for two academic quarters. Final Order at 3. Ultimately, the University's Board of Trustees adopted this recommendation, concluding, among other things, that the hearing closure had been proper under the Faculty Handbook, which the board characterized as a "provision of law." Final Order at 46-48.

¶18 Mills petitioned for review of the board's decision pursuant to the state Administrative Procedure Act. The superior court denied relief. Mills then sought direct review in our Supreme Court, which transferred the case to us.

## II

¶19 Under the Administrative Procedure Act, relief from a final agency decision is appropriate only if the decision "is in violation of constitutional provisions on its face or as applied"; "[t]he agency has engaged in unlawful procedure or decision-making process, or has failed to follow a prescribed procedure"; "[t]he agency has errone-

---

[3] "The hearing will be private, unless the hearing panel, in consultation with the Provost and only with the agreement of the faculty member, decides that the hearing should be public."

slyously interpreted or applied the law"; "[t]he order is inconsistent with a rule of the agency unless the agency explains the inconsistency by stating facts and reasons to demonstrate a rational basis for inconsistency"; or "[t]he order is arbitrary or capricious." RCW 34.05.570(3)(a), (c), (d), (h), (i). In reviewing an agency decision, the appellate court "sits in the same position as the superior court."[4] *Tapper v. Employment Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993).

## III

¶20 Mills contends on appeal that the University's disciplinary actions violated the terms of his employment contract—in the form of the University's Faculty Handbook[5]—both procedurally and substantively. He is wrong on both counts.

¶21 Prior to filing any statement of charges, the Faculty Handbook requires that the provost (1) attempt to settle the issue informally with the faculty member and (2) engage a three-person faculty panel to conduct an inquiry and further attempt a settlement. There is no legitimate dispute that the provost did these things. Instead, the dispute arises because the provost suspended Mills, with pay, during the period in which these activities were occurring.

---

[4] It is unnecessary for us to address the superior court's decision, except to note the erroneous nature of that court's sua sponte ruling that Mills waived any statutory challenge to the closure of the disciplinary hearing by not seeking an extraordinary writ. Barring minor exceptions not at issue here, the Administrative Procedure Act is "the exclusive means of judicial review of agency action." RCW 34.05.510. Again, barring minor exceptions not at issue here, a person may seek judicial review pursuant to the Administrative Procedure Act "only after exhausting all administrative remedies available within the agency whose action is being challenged." RCW 34.05.534. Mills was required to—and properly did—pursue relief from the closure order from the Board of Trustees prior to petitioning a court. Nothing Mills did suggested any intent to abandon his challenge to the closure order. There was no waiver.

[5] The parties agree that the Faculty Handbook is incorporated into the employment contracts of all professors at the University.

■ ¶22 The Faculty Handbook states:

> From the time at which charges are specified, the faculty member may be suspended . . . only if immediate harm to the faculty member or others is threatened by continuance. Before suspending a faculty member, pending an ultimate determination of the faculty member's status through the institution's hearing procedures, the Provost will consult with the Executive Council of the Faculty Senate concerning the propriety, the length, and the other conditions of any suspension. This consultation will occur within 10 working days of the filing of the statement of charges. . . . Salary will continue during the period of the suspension.

¶23 According to Mills, this provision requires the conclusion that the provost may not temporarily suspend a faculty member from teaching prior to the imposition of formal discipline without first making a "finding" that the faculty member's continued teaching threatens "immediate harm," and without consulting the Faculty Senate within 10 days of the charges being filed.

¶24 The problem with this theory is that the above-quoted provision expressly addresses events that occur only "[f]rom the time at which .charges are specified." The Faculty Handbook provides no limitation on the provost's authority over University employees in the period *between* when an investigation is initiated and the filing of formal disciplinary charges. No legal basis exists to read the *absence* of such restrictions as a limitation on the power of the University to place a professor on administrative leave while investigating alleged misconduct.

■ ¶25 Mills is also incorrect in asserting that the University breached its substantive duties under his contract. He contends that breaches of the Faculty Code of Ethics—such as the breaches that provided the basis for his suspension—may never be relied upon by the University to impose formal discipline upon a faculty member because violations of the Faculty Code of Ethics are not listed causes for serious discipline in the Faculty Handbook. Contrary to Mill's contention, however, compliance with the Faculty

Code of Ethics is included by reference as one of the duties of professors at the University and, thus, a breach of the Faculty Code of Ethics may legitimately serve as the basis for the imposition of serious discipline by the University.

¶26 Under the terms of the Faculty Handbook, good cause to terminate a tenured professor exists if the professor is guilty of, among other things, "serious and persistent neglect of faculty duties" or behavior that affects another person's "ability to carry out his or her academic, scholarly, or professional university rights or responsibilities in a substantial way." The Faculty Handbook states that faculty duties, the dereliction of which may lead to discipline, "are listed in [Faculty Handbook] Section I, Part III, paragraphs C *and* D." (Emphasis added.) Paragraph D, subparagraph 2, provides in turn that "[f]aculty members have an obligation to adhere to and behave in keeping with the principles of faculty conduct contained in the Code of Faculty Ethics." Mills's argument boils down to nothing more than an erroneous contention that he cannot be found to have neglected his duties because only paragraph C is entitled "Faculty Duties," whereas paragraph D is instead entitled "Scholarly and Professional Qualifications of Faculty Members." This reading is contradictory to the plain text of the Faculty Handbook's disciplinary provisions, which also expressly cross-reference paragraph D as describing "faculty duties."

¶27 The University did not breach its employment contract with Mills.

## IV

¶28 Mills next contends that the Faculty Code of Ethics violated his Fourteenth Amendment due process rights, both facially and as applied, because its provisions are too vague to be constitutionally enforceable. He is incorrect.

¶29 It is well established that nonprobationary public employees may be discharged under a "for cause" standard, and that this standard is sufficiently definite to satisfy due

process, even as applied in the context of discipline related to speech. *Arnett v. Kennedy*, 416 U.S. 134, 161, 164-65, 94 S. Ct. 1633, 40 L. Ed. 2d 15 (1974) (lead opinion and concurrence of Powell, J.). This is so because the standard is construed to exclude discipline imposed as a result of engaging in constitutionally protected speech. *Arnett*, 416 U.S. at 162. This rule has been widely applied in the context of tenured university professors contesting discipline imposed against them for assorted misconduct. *E.g.*, *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1137 (3d Cir. 1992) ("standards of sound scholarship and competent teaching" not unconstitutionally vague); *Garrett v. Mathews*, 474 F. Supp. 594, 599 (N.D. Ala. 1979) ("adequate cause" not vague), *aff'd*, 625 F.2d 658 (5th Cir. 1980); *Barham v. Univ. of N. Colo.*, 964 P.2d 545, 548-49 (Colo. Ct. App. 1997) ("legally sufficient ground" not vague); *Phillips v. State Bd. of Regents*, 863 S.W.2d 45, 50 (Tenn. 1993) ("capricious disregard of accepted standards of professional conduct" not vague).

■ ¶30 Notwithstanding this clear authority, Mills argues that the standards applied in his case are unconstitutionally vague. He cites the Ninth's Circuit's decision in *Cohen v. San Bernardino Valley College*, 92 F.3d 968 (9th Cir. 1996), in support of this contention. And, it is true, *Cohen* did hold that a college sexual harassment policy was unconstitutionally vague when applied to a professor's boorish and innuendo-laden classroom presentation style. 92 F.3d at 972. But Mills is unlike the plaintiff in *Cohen*: the vast majority of the conduct for which Mills was disciplined was utterly unrelated to any pedagogical objective whatsoever, and so was not protected speech. Further, as the University correctly observes, *Adamian v. Jacobsen*, 523 F.2d 929, 932-33 (9th Cir. 1975), the primary precedent relied upon in *Cohen*, sharply distinguishes "for cause" policies used to stifle the content of speech (unacceptable) from those aimed at preserving the order and safety of the university environment (acceptable). Our courts have adopted this approach. *Stastny v. Bd. of Trs.*, 32 Wn. App. 239, 254, 647 P.2d 496 (1982).

¶31 Moreover, it is also well established that because the "vagueness doctrine is based on fair notice that certain conduct puts persons at risk of discharge[,] standards are not void for vagueness as long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk." *San Filippo*, 961 F.2d at 1136 (citing *Arnett*, 416 U.S. at 159). That is, an otherwise vague standard will nonetheless be considered constitutional if the party to whom it is applied is given actual notice of the type of conduct that may later result in discipline. *Simmons v. Vancouver Sch. Dist. No. 37*, 41 Wn. App. 365, 380, 704 P.2d 648 (1985). Here, University officials repeatedly described to Mills precisely the type of conduct considered unacceptable under the Faculty Handbook. Mills repeatedly disregarded these warnings and, unsurprisingly, was disciplined.

¶32 The University's Faculty Code of Ethics is not unconstitutionally vague.

V

¶33 Mills contends that the discipline imposed upon him by the University unduly restricts his academic freedom as a professor, and so violates the guaranties of the First Amendment to the United States Constitution and article I, section 5 of the Washington State Constitution. His contention is without merit.

¶34 Mills is correct that "[a]cademic freedom is . . . a special concern of the First Amendment." *Stastny*, 32 Wn. App. at 249. But " '[i]t does not follow that because academic freedom is inextricably related to the educational process it is implicated in every employment decision of an educational institution.' Academic freedom is not a license for . . . activities which are internally destructive to the proper function of the university or disruptive to the education process." *Stastny*, 32 Wn. App. at 249-50 (citation omitted) (quoting *Kunda v. Muhlenberg Coll.*, 621 F.2d 532, 547 (3d Cir. 1980)). "In determining whether an employee's

dismissal violates his constitutional right to free speech, the interest of the employee . . . must be balanced against the interests of the state as employer." *Sinnott v. Skagit Valley Coll.*, 49 Wn. App. 878, 881, 746 P.2d 1213 (1987) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 284, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977)). "Appropriate state interests against which First Amendment rights of teachers must be balanced include . . . '(1) The need to maintain harmony among coworkers; (2) the need to curtail conduct impeding the teacher's proper and competent performance of his daily duties; [and] (3) the need to prevent activities disruptive of the educational process and to provide for the orderly functioning of the university.'" *Sinnott*, 49 Wn. App. at 881-82 (quoting *Stastny*, 32 Wn. App. at 251).

¶35 At the outset, it is important to make clear that the vast majority of the conduct for which Mills was disciplined was entirely unrelated to any pedagogical purpose, and thus did not constitute protected speech. To be explicit, none of the following behaviors implicate academic freedom in the slightest, or are protected by either the First Amendment or article I, section 5: verbally abusing faculty colleagues with discriminatory and sexual innuendo; harassing, intimidating, demeaning, and insulting students outside of the classroom; verbally abusing staff members and student assistants serving in an administrative capacity; brandishing weaponry; or threatening others with bodily harm or death. While Mills fixates on the fact that some of the statements for which he was disciplined occurred in the classroom, the simple fact is that the vast majority of the conduct for which he was disciplined occurred exclusively outside of the classroom. These instances of conduct alone would have justified the University's imposition of discipline and are not the proper subject of First Amendment academic freedom analysis.

¶36 With respect to Mills's conduct that did occur in the classroom, we are unable to conclude that the University's interests were outweighed by Mills's. For example,

contrary to Mills's assertions, his remarks to the student recovering from cancer did *not* serve a pedagogical purpose. The board concluded as much, a determination that we consider to be more properly characterized as a finding of fact than as a conclusion of law. *See* Final Order at 33-34 ("The statement served no legitimate pedagogical purpose, was not germane to the subject matter of the course, and was a particularly egregious instance of emotional abuse, intimidation, exploitation, and Professor Mills's characteristic inability to exercise appropriate self-discipline and restraint in dealing with students' personal and academic challenges."). The evidence supports this finding—which, we observe, the Board was far better qualified than we are to make.

¶37 Mills is unable to point to any other conduct for which he was disciplined that had even remotely pedagogical objectives. In any event, balanced against the University's interest in maintaining a safe classroom environment in the Theatre Arts department and harmonious relations among Theatre Arts faculty, Mills's free speech interest in promoting the subject of his discipline by deliberately harassing and degrading certain groups of students, and by playing on the insecurities of less assertive students generally, is not more substantial than the University's interest in protecting students from Mills's abusive behavior. In other words, despite his attempts to categorize his invective as a teaching device, we doubt that Mills has any First Amendment interest in presenting a stream of insults directed at various discrete (and often constitutionally protected) groups. *See, e.g., Martin v. Parrish*, 805 F.2d 583, 583 (5th Cir. 1986) (First Amendment does not protect "the abusive use of profanity in the classroom.").

¶38 Mills's free speech rights were not violated.

## VI

¶39 Finally, Mills contends that the University violated the open hearing provisions of the Administrative Proce-

dure Act by closing his disciplinary hearing without legal authority to do so. We agree.

¶40 RCW 34.05.449(5) provides that agency adjudications must be "open to public observation, except for the parts that the presiding officer states to be closed under a provision of law expressly authorizing closure or under a protective order entered by the presiding officer pursuant to applicable rules." There is no dispute that the University neither sought a protective order nor followed the applicable procedures for obtaining one.

¶41 Rather, both the Hearing Panel and the Board of Trustees concluded that the Faculty Handbook constituted a "provision of law" authorizing closure without a protective order. And, it is true, the Faculty Handbook does state that adjudicative hearings on faculty disciplinary charges "will be private, unless the Hearing Panel, in consultation with the Provost and only with the agreement of the faculty member, decides that the hearing should be public."

¶42 The problem with the University's reliance on this statement, however, is that a statement in an internal agency procedural manual about how hearings should be conducted is not a "provision of law." "Unlike administrative rules and other formally promulgated agency regulations, internal policies and directives generally do not create law." *Joyce v. Dep't of Corr.*, 155 Wn.2d 306, 323, 119 P.3d 825 (2005). That is, an "administrative rule has force of law only if the agency promulgated it with delegated authority." *Pierce County v. State*, 144 Wn. App. 783, 836, 185 P.3d 594 (2008). And here, although the Board of Trustees has been delegated authority to enact rules governing faculty relations, RCW 28B.35.120(2) and (12), not everything that the board does that affects faculty is automatically a "rule" having the force and effect of law.

¶43 The only authority that the University offers in support of the contrary assertion is the Administrative Procedure Act's definition of "Rule," which, according to the University, stands for the proposition that "institutions of higher education are not required to codify their policies

and procedures relating to 'employment relationships' in the Washington Administrative Code." According to the University, this in turn means that it was relieved of any obligation to follow the Administrative Procedure Act's rule-making procedures when promulgating any regulation that affects employee discipline.

¶44 But this is an incorrect interpretation of this provision. RCW 34.05.010(16) provides, " 'Rule' . . . does not include . . . rules of institutions of higher education involving standards of admission, academic advancement, academic credit, graduation and the granting of degrees, employment relationships, or fiscal processes." Contrary to the University's contention, this does not mean that the Administrative Procedure Act's definition of "Rule" empowers public universities in Washington to freely pronounce regulations with the force of law without engaging in notice-and-comment rule making. On the contrary—the entire purpose of the exemption in RCW 34.05.010(16) is to specify that certain actions of the University are *not* "rules" with the general force of law. Indeed, during oral argument before us, counsel for the University made clear that when the Administrative Procedure Act was adopted, the legislature ensured that the state's public universities were not restricted to announcing principles enforceable against students and employees through quasi-legislative (i.e., law making) mechanisms.

¶45 Instead, in the listed subject areas, the University may propound general standards of conduct through internal policy making, or—as in the case of the University's relationships to its professors—through the integration of internal policies into employment contracts. This gives the University the flexibility to utilize a wide variety of generally applicable policies in dealing with its students and employees without the burden of notice-and-comment rule making, but it also means that those "rules" are simply internal policies, rather than "Rule[s]" as that term is used in the Administrative Procedure Act—that is, generally applicable standards having the force and effect of law,

which are announced by executive agencies based on authority delegated to them by the legislature.

¶46 Here, there was no "provision of law" governing the closure of employee discipline hearings because there could be no such provision of law. The Administrative Procedure Act's definition of "Rule" specifically precludes the enactment of such a provision of law by the University acting in its quasi-legislative capacity. Rather, in order to guarantee the University flexibility, employment relationships, including the procedural aspects of employee discipline, have been demarcated by the legislature as an area of private contract and internal policy rather than of rule making.

¶47 The closure of Mills's disciplinary hearing violated RCW 34.05.449(5). The Faculty Handbook did not constitute a "provision of law" exempting the University from RCW 34.05.449(5)'s procedural requirements. Rather, the Faculty Handbook was a private contract between Mills and the University.[6]

¶48 Our next inquiry, then, is whether the Administrative Procedure Act entitles Mills to a remedy and, if so, that remedy's nature. We conclude that we must vacate the board's final order and remand to the University for a new hearing.

¶49 Under the Administrative Procedure Act, the type of agency action at issue defines the scope, nature, and standards for judicial relief available to the complaining party. The Administrative Procedure Act specifically enumerates standards justifying judicial relief from the final order in an adjudicative proceeding,[7] including a statement that a

---

[6] Presumably, the University does not contend that it may avoid the Administrative Procedure Act's open hearing provisions by contracting to do so. A "contract that is contrary to the terms and policy of an express legislative enactment is illegal and unenforceable." *Tanner Elec. Coop. v. Puget Sound Power & Light*, 128 Wn.2d 656, 669, 911 P.2d 1301 (1996).

[7] There is no legitimate dispute that Mills's disciplinary hearing was an "adjudicative proceeding" as defined by the Administrative Procedure Act. RCW 34.05.010(1) defines "Adjudicative proceeding" as any "proceeding before an agency in which an opportunity for hearing before that agency is required by statute or constitutional right before or after the entry of an order by the agency."

court "*shall* grant relief . . . if it determines that . . . [t]he agency has engaged in unlawful procedure or decision-making process, or has failed to follow a prescribed procedure." RCW 34.05.570(3)(c) (emphasis added).

¶50 Both Mills and the University misunderstand the remedy required in this case. The University contends that Mills is not entitled to relief at all because the hearing closure did not "substantially prejudice[ ]" his case. It bases this assertion on RCW 34.05.570(1)(d)'s statement that "[g]enerally[, t]he court shall grant relief only if it determines that a person seeking judicial relief has been substantially prejudiced by the action complained of." But RCW 34.05.570(3) expressly specifies that which constitutes "prejudice" in adjudicative proceedings by enumerating actions from which the court *shall* grant relief, including orders that result from an "unlawful procedure or decision-making process."

¶51 Mills, on the other hand, relies solely upon the harmless-error-style analysis applied in the context of cases examining the *constitutional* open justice guaranty, rather than the statutory open hearing provisions of the Administrative Procedure Act, which are those applicable to executive agency adjudications. But here, both the right and the remedy are statutory; inquiring as to whether a "public trial right" violation is "de minimus," *State v. Easterling*, 157 Wn.2d 167, 180, 137 P.3d 825 (2006), is misguided. The *statutory* open hearing right may usually be restricted by the agency itself, provided it properly promulgates a rule allowing it to do so. Absent such a rule, however, an open hearing violation necessarily renders the adjudication an "unlawful procedure" warranting relief.

¶52 Here, the closure of Mills's disciplinary hearing was contrary to the requirements of RCW 34.05.449(5) and, thus, constituted an unlawful adjudicative procedure. Pur-

It has long been recognized that a tenured faculty member at a public university has a due process property interest in continued employment that may not be impaired absent a "proper inquiry." *E.g.*, *Slochower v. Bd. of Higher Educ.*, 350 U.S. 551, 559, 76 S. Ct. 637, 100 L. Ed. 692 (1956).

suant to RCW 34.05.570(3)(c), Mills is entitled to relief from the Board of Trustees' review decision and final order. That order is vacated. Because this court stands in the same position as the superior court and there is no additional relief that the superior court may give, we remand directly to the agency (i.e., the University) for a new hearing.[8]

## VII

¶53 Mills requests an award of reasonable attorney fees. RCW 4.84.350(1) provides for such an award, stating that "a court shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees, unless the court finds that the agency action was substantially justified or that circumstances make an award unjust." Here, Mills qualifies for an attorney fee award because he is entitled to relief from the unlawful closure of his disciplinary hearing, which was not substantially justified. Upon proper application, our commissioner will enter an appropriate award.

¶54 The Board of Trustees' review decision and final order is vacated. This cause is remanded to the University for a new hearing.

APPELWICK and LEACH, JJ., concur.

Reconsideration denied June 25, 2009.

Review denied for appellant and review of issues raised in respondent's answer granted at 167 Wn.2d 1020 (2010).

---

[8] Having resolved this question on statutory grounds, we need not address Mills's related contention that he had a state constitutional right to an open administrative hearing. *Brunson v. Pierce County*, 149 Wn. App. 855, 862, 205 P.3d 963 (2009) (we avoid reaching constitutional issues when able to decide cases on nonconstitutional grounds).