[No. 83597-7.  En Banc.]
Argued October 28, 2010.    Decided February 3, 2011.

PERRY MILLS, *Respondent*, v. WESTERN WASHINGTON UNIVERSITY, *Petitioner*.

904

*Robert M. McKenna, Attorney General,* and *Derek L. Edwards* and *Wendy K. Bohlke, Senior Counsel,* for petitioner.

*James E. Lobsenz* (of *Carney Badley Spellman*), for respondent.

*Katherine George* on behalf of Allied Daily Newspapers of Washington and Washington Newspaper Publishers Association, amici curiae.

¶1 ALEXANDER, J. — We granted Western Washington University's (University) petition to review a decision of the Court of Appeals in which that court reversed the superior court's denial of Perry Mills's request for relief from an order of the University's Board of Trustees suspending Mills for two academic quarters. The basis of the court's decision was that the University violated the Administrative Procedure Act (APA), chapter 34.05 RCW, by closing Mills's disciplinary hearing to the public. We reverse the Court of Appeals.

I

¶2 Perry Mills has been a professor at Western Washington University for more than 20 years.[1] In 1994, the University granted Mills tenure as an associate professor in its Theatre Arts Department. In 1998, Mills's application for a promotion to full professor was denied based on the recommendation of Thomas Ward, the chair of the Theatre Arts Department. In his recommendation against promotion, Ward noted that Mills often berated and demeaned students and colleagues and had "an extremely high student complaint rate." Clerk's Papers at 1461. Two years later, Mills received a letter from the new department chair, Mark Kuntz, admonishing Mills for making "off-color remarks" about colleagues, women, gay students, and minorities. *Id.* Kuntz reminded Mills that he was bound by the faculty code of ethics and concluded by saying, " 'Your behavior must change.' " *Id.*

---

[1] This section is based on the unchallenged findings of fact contained in the decision and final order of the Board of Trustees. Unchallenged findings of fact are treated as verities on appeal. *Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 407, 858 P.2d 494 (1993).

¶3 In September 2001, members of the theatre arts faculty and staff addressed a letter to Bertil van Boer, the dean of the College of Fine and Performing Arts, expressing their " 'real and tangible fear' occasioned by Mills's carrying of a registered firearm and a large knife on campus and in the classroom, together with his belligerent rants about killing people who offended him." *Id.* at 1455. Following receipt of the letter, Dean van Boer advised Mills not to carry weapons on campus. At the same time, Kuntz sent Mills what Kuntz described as the " 'third in a series of memos . . . concerning your behavior,' " stating, " 'Your behavior scares people. You know it. Your repeated need to express your desire to "kill" people is not appropriate, and will stop . . . . Your lack of sensitivity or care about the needs of students, staff, and colleagues must stop.' " *Id.* at 1461.

¶4 Mills's inappropriate behavior did not stop. In the fall of 2001, Mills told a female professor in the Theatre Arts Department that "she had better keep her legs closed, because she could not be expected to teach students the same way she got her doctorate." *Id.* at 1445. Mills continued verbally abusing this professor over the next two years, calling her a " 'bimbo' " and a " 'slut' " to her face and to his students in her absence. *Id.* After the University granted tenure to this professor, she reported Mills's conduct to Dean Carol Edwards. Mills called another professor " 'just a stupid faggot.' " *Id.* at 1446. When that professor informed Mills that he would not tolerate his offensive language, Mills began referring to him as " 'Precious' " in a lilting manner that mocked the professor's sexual orientation. *Id.*

¶5 Mills also disparaged members of the staff, telling the department's administrative assistant, " 'You're just a stupid bitch. You're just white trailer trash.' " *Id.* at 1447. On another occasion, Mills screamed at a library assistant who had failed to return a film to the library, " 'You bitch, you screwed up,' " and then asked, " 'Is she retarded?' " *Id.* at 1457. In addition, Mills verbally abused students in his classroom, especially female students, calling them " 'shit for brains,' 'blondies,' " and " 'f . . . ing lazy girl[s].' " *Id.* at

1456. He told one student that she was " 'a 400-pound canary who warbles nothingness' and 'makes him sick.' " *Id.* In 2004, the dean of the College of Fine and Performing Arts, Carol Edwards, received a complaint from a student who had just returned to class after undergoing treatment for cancer. The student, who had lost her hair due to chemotherapy, expressed her reticence about presenting her play for review by the class. Mills told her that not offering her work for review would be just the same as dying from cancer.

¶6 After receiving complaints about the above-mentioned conduct, the University provost suspended Mills with pay in October 2004 pending an investigation. The provost subsequently issued a formal statement of charges against Mills. The University then convened a hearing panel of five faculty members selected from the Faculty Senate's Standing Committee on Grievances and Sanctions. Former superior court judge Robert Alsdorf, who was appointed to serve as a nonvoting presiding officer, indicated that "the default setting would be that the hearing would be private." *Id.* at 324. As support for this decision, he cited section XVII.2.d of the University's Faculty Handbook, which provided, "The hearing will be private unless the Hearing Panel, in consultation with the Provost and only with the agreement of the faculty member, decides that the hearing should be public." *Id.* at 207, 323-24. Mills, who was represented by counsel, argued that the hearing should be open to the public. The panel decided to close the hearing and asked a newspaper reporter in attendance to depart.

¶7 At the conclusion of the hearing, the panel recommended that Mills be suspended without pay for two academic quarters. Mills appealed the decision to the University's Board of Trustees, which affirmed the panel's recommendation. It concluded, among other things, that the hearing was properly closed pursuant to section XVII.2.d of the University's Faculty Handbook, which the board regarded as a "provision of law" for purposes of RCW 34.05.449(5).

¶8 Mills sought judicial review in the Whatcom County Superior Court pursuant to the APA. *See* RCW 34.05.570. The superior court denied relief. Mills then appealed directly to this court, but we transferred the case to the Court of Appeals. At that court, Mills argued variously that the University had breached the terms of his employment contract, that the Faculty Code of Ethics was unconstitutionally vague, that his freedom of speech had been abridged, and that the closure of his disciplinary hearing had been unlawful. *Mills v. W. Wash. Univ.*, 150 Wn. App. 260, 264, 208 P.3d 13 (2009). Although the Court of Appeals rejected Mills's contract and constitutional claims, it held that the University violated the APA by closing Mills's hearing to the public. It, therefore, reversed the University's disciplinary order and remanded for a new hearing.

¶9 Mills and the University both petitioned this court for review. We denied Mills's petition and granted the University's petition. *Mills v. W. Wash. Univ.*, 167 Wn.2d 1020, 225 P.3d 1011 (2010). Allied Daily Newspapers of Washington and the Washington Newspaper Publishers Association jointly filed a brief as amici curiae in support of Mills.

## II

¶10 The APA governs judicial review of agency orders in adjudicative proceedings. *Densley v. Dep't of Ret. Sys.*, 162 Wn.2d 210, 216, 173 P.3d 885 (2007). RCW 34.05.570(3) provides, in pertinent part:

> The court shall grant relief from an agency order in an adjudicative proceeding only if it determines that:
>
> . . . .
>
> (c) The agency has engaged in unlawful procedure or decision-making process, or has failed to follow a prescribed procedure.[2]

---

[2] The full text of RCW 34.05.570(3) is as follows:

"**Review of agency orders in adjudicative proceedings.** The court shall grant relief from an agency order in an adjudicative proceeding only if it determines that:

III

A. Did the University engage in an unlawful procedure or decision-making process by closing Mills's disciplinary hearing to the public?

▉▉▉ ¶11 The APA requires agency hearings to be "open to public observation, except for the parts that the presiding officer states to be closed under a provision of law expressly authorizing closure." RCW 34.05.449(5). The APA also states that, as an " '[i]nstitution[ ] of higher education,' " the University is an " '[a]gency.' " RCW 34.05.010(7), (2). Because the University based its decision to close Mills's disciplinary hearing to the public on section XVII.2.d of its Faculty Handbook, the question before us is whether that rule is a "provision of law" within the meaning of RCW 34.05.449(5).

¶12 This court has said that a " 'rule has the force and effect of law, if promulgated in accordance with a legislative delegation.' " *Manor v. Nestle Food Co.*, 131 Wn.2d 439, 445,

"(a) The order, or the statute or rule on which the order is based, is in violation of constitutional provisions on its face or as applied;

"(b) The order is outside the statutory authority or jurisdiction of the agency conferred by any provision of law;

"(c) The agency has engaged in unlawful procedure or decision-making process, or has failed to follow a prescribed procedure;

"(d) The agency has erroneously interpreted or applied the law;

"(e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter;

"(f) The agency has not decided all issues requiring resolution by the agency;

"(g) A motion for disqualification under RCW 34.05.425 or 34.12.050 was made and was improperly denied or, if no motion was made, facts are shown to support the grant of such a motion that were not known and were not reasonably discoverable by the challenging party at the appropriate time for making such a motion;

"(h) The order is inconsistent with a rule of the agency unless the agency explains the inconsistency by stating facts and reasons to demonstrate a rational basis for inconsistency; or

"(i) The order is arbitrary or capricious."

932 P.2d 628 (1997) (quoting 2 Am. Jur. 2d *Administrative Law* § 160, at 182 (1994)). Significantly, the legislature has authorized institutions of higher education to establish rules governing peer review proceedings. The pertinent statute, RCW 28B.10.648(2), provides, in part, that "[p]eer review proceedings shall be pursuant to rules and regulations promulgated by the respective institutions of higher education." It is undisputed that Mills's hearing before a panel of his fellow professors was a "peer review proceeding."

¶13 The Court of Appeals determined, however, that the University's rule authorizing the closure of faculty disciplinary hearings was not a "provision of law" because the APA's definition of " 'Rule' " specifically excludes the "rules of institutions of higher education involving . . . employment relationships." RCW 34.05.010(16). In other words, according to the Court of Appeals, a rule must fall within the APA's definition of " 'Rule' " to have the force of law. *Mills*, 150 Wn. App. at 277-78.

¶14 This neat dichotomy between "Rules" with a capital "R," which have the force of law, and second-rate rules, which do not have the force of law, finds no support in our jurisprudence. Rather, as the University points out, the paramount consideration is whether the rule (or regulation, order, directive, or policy) was promulgated pursuant to legislative delegation. Indeed, in *State v. Brown*, 142 Wn.2d 57, 62, 11 P.3d 818 (2000), we said, "To have the force of law, an administrative regulation must be properly promulgated pursuant to a legislative delegation." In keeping with that principle, we held that, because the Department of Corrections (DOC) had promulgated its list of "serious infraction[s]" pursuant to the wrong statute, the regulation in question lacked the force of law.[3] *Id.* at 61. We explained that "[a]gencies are creatures of law and are required to

---

[3] Notably, the APA does not apply to the DOC, RCW 34.05.030(1)(c), but our decision in *Brown*, 142 Wn.2d 57, did not rest on the exclusion of DOC regulations from the APA's definition of "Rule," but on the DOC's failure to promulgate its regulation pursuant to legislative delegation. *See Brown*, 142 Wn.2d at 61-62.

promulgate regulations pursuant to the statute or statutes authorizing them." *Id.* at 62; *see also Joyce v. Dep't of Corr.*, 155 Wn.2d 306, 323, 119 P.3d 825 (2005) ("because the Department's policy directives are not promulgated pursuant to legislative delegation, they do not have the force of law").

¶15 Our focus on legislative delegation is consistent with the United States Supreme Court's decision in *Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S. Ct. 1705, 60 L. Ed. 2d 208 (1979). In that case, the Court explained that, in order to have the force and effect of law, a regulation "must be rooted in a grant of . . . power by the Congress and subject to limitations which that body imposes." *Id.* at 302. The Court went on to say that "[w]hat is important is that the reviewing court reasonably be able to conclude that the grant of authority contemplates the regulations issued." *Id.* at 308.[4]

¶16 Thus, the question becomes whether section XVII.2.d of the University's Faculty Handbook was promulgated pursuant to legislative delegation. As we have seen, the legislature has provided that "[p]eer review proceedings shall be pursuant to rules and regulations promulgated by the respective institutions of higher education." RCW 28B.10.648(2). More broadly, the legislature has granted the "board of trustees of . . . regional universities" the authority to "promulgate such rules and regulations . . . as the board . . . may in its discretion deem necessary or appropriate to the administration of the regional university." RCW 28B.35.120(12). We conclude that these grants of authority contemplate a regulation such as section XVII.2.d of the University's Faculty Handbook directing that faculty disciplinary hearings be closed to the public.

¶17 Our conclusion is bolstered by legislative history. In its summary of Substitute House Bill 915, which became

---

[4] When the legislature enacted the current APA in 1988, it expressed its intent that courts would "interpret provisions of this chapter consistently with decisions of other courts interpreting similar provisions of other states, the federal government, and model acts." RCW 34.05.001.

RCW 28B.10.648, the House Committee on Higher Education said, "Peer review procedures shall be conducted *privately* under rules adopted by the institution." 1984 FINAL LEGISLATIVE REPORT, 48th Wash. Leg., at 48 (emphasis added).[5] We are satisfied that the University's rule authorizing the closure of faculty disciplinary proceedings is consistent with legislative intent. Because section XVII.2.d of the University's Faculty Handbook was promulgated pursuant to legislative delegation, we hold that it is a "provision of law" expressly authorizing closure within the meaning of RCW 34.05.449(5). The University, therefore, did not engage in an unlawful procedure by closing Mills's disciplinary hearing to the public.[6]

B. Does article I, section 10 of the Washington
Constitution apply to faculty disciplinary proceedings?

¶18 Mills contends that, even if the closure of his disciplinary hearing was pursuant to a provision of law, it ran afoul of article I, section 10 of the Washington Constitution, which says, "Justice in all cases shall be administered openly, and without unnecessary delay." We have recognized that, "by its terms," article I, section 10 "is not limited to trials but includes all judicial proceedings." *Federated Publ'ns, Inc. v. Kurtz*, 94 Wn.2d 51, 60, 615 P.2d 440 (1980). The question is whether it also applies to the

---

[5] When the legislature enacted RCW 28B.10.648, the APA did not include institutions of higher education in its definition of "agency." They were made subject to the APA in 1988. William R. Andersen, *The 1988 Washington Administrative Procedure Act—An Introduction*, 64 WASH. L. REV. 781, 786 (1989). Although the legislature indicated that one of its purposes in enacting the current APA in 1988 was to "provide greater public access . . . to administrative decision making," it went on to say that "to the greatest extent possible and unless this chapter clearly requires otherwise, current agency practices . . . shall remain in effect." RCW 34.05.001. Thus, the legislature's decision to include institutions of higher education under the APA did not signal a rejection of the policies embodied in RCW 28B.10.648.

[6] We note that, even if the University had engaged in an unlawful procedure, Mills would not have been entitled to relief unless he could have shown that he was "substantially prejudiced" by the closure of his disciplinary hearing to the public. *Densley*, 162 Wn.2d at 226.

quasi-judicial proceedings conducted by administrative agencies.

¶19 In *Washington Water Jet Workers Ass'n v. Yarbrough*, 151 Wn.2d 470, 477, 90 P.3d 42 (2004), we said, "When interpreting constitutional provisions, we look first to the plain language of the text and will accord it its reasonable interpretation. . . . The words of the text will be given their common and ordinary meaning, as determined at the time they were drafted." In keeping with this approach, we note that, when article I, section 10 was drafted, the word "case" was defined as "[i]n law: a cause or suit *in court*; any instance of litigation; as the case was tried last term," Suppl. Br. of Resp't at 17 (emphasis added) (quoting 1 THE CENTURY DICTIONARY 840 (1889)), or "A general term for an action, cause, suit, or controversy, at law or in equity. A question contested *before a court of justice." Id.* (emphasis added) (quoting 1 HENRY CAMPBELL BLACK, A DICTIONARY OF LAW 175 (1891)). The Framers, it seems, had only the courts within the judicial branch in mind when they spoke of the administration of "justice in all *cases."*

¶20 Amici cite *Bellingham Bay Improvement Co. v. City of New Whatcom*, 20 Wash. 53, 54 P. 774, *aff'd*, 20 Wash. 231, 55 P. 630 (1898), for the proposition that "justice in all cases" embraces the quasi-judicial proceedings conducted by administrative agencies. In *Bellingham Bay*, we held that a statute that authorized city councils to reassess property did not violate article IV, section 1 of the Washington Constitution, which vests the "judicial power" of the State in a supreme court, superior courts, justices of the peace, and such inferior courts as the legislature may provide. In so holding, we said that "this article of the constitution must have been enacted with the knowledge that *quasi judicial powers* have from time immemorial been conferred upon *administrative bodies* and officers." *Id.* at 58 (emphasis added). Amici assert that the authors of the state constitution knew that administrative bodies, as well as courts, exercised the power to determine the rights of citizens and, for that reason, "justice in all cases" must be

read as applying to quasi-judicial proceedings, as well as the proceedings of the judicial branch.

¶21 *Bellingham Bay* does not, in our judgment, support this reading of the state constitution. The whole point of that decision was that the term "judicial power" in article IV, section 1 did *not* embrace the quasi-judicial power exercised by administrative and executive bodies, even though the drafters of the state constitution knew that such power had been exercised from "time immemorial." Since the exercise of quasi-judicial power was not embraced by the term "judicial power" in article IV, section 1, there is no reason to assume that it was meant to be embraced by the term "justice in all cases" in article I, section 10. This is especially true given that the great flowering of administrative agencies occurred long after the ratification of the constitution. Furthermore, decisions from the period following the proliferation of administrative agencies indicate that the "stage" at which justice is " 'administered' and therefore constitutionally required to be open" is not reached until a superior court reviews the action of an administrative agency on appeal. *Cohen v. Everett City Council*, 85 Wn.2d 385, 389, 535 P.2d 801 (1975). We conclude, therefore, that article I, section 10 does not apply to the quasi-judicial proceedings of administrative agencies.

## IV

¶22 We hold that the University did not violate the APA or article I, section 10 of the Washington Constitution by closing Mills's disciplinary hearing to the public. Therefore, we reverse the Court of Appeals.

MADSEN, C.J.; C. JOHNSON, CHAMBERS, OWENS, FAIRHURST, J.M. JOHNSON, and STEPHENS, JJ.; and SANDERS, J. PRO TEM., concur.