

**FILED**
**FEBRUARY 16, 2021**
In the Office of the Clerk of Court
WA State Court of Appeals Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 36213-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| JEREMIAH A. SMITH also known as | ) | |
| GLENN A. AKERS, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Jeremiah A. Smith, also known as Glenn Akers, challenges two of

his convictions and his sentence as a persistent offender. Because sufficient evidence and

sufficient findings of fact after a bench trial support his convictions, we affirm his

convictions for first degree burglary and first degree murder. Because he did not

challenge the constitutionality of the persistent offender statute before the sentencing

court and because he does not show manifest constitutional error, we also affirm his

sentence.

No. 36213-2-III
*State v. Jeremiah A. Smith aka Glenn Akers*

FACTS

The trial court convicted Glenn Akers of first degree murder as a result of his shooting Cesar Medina at Northwest Accessories, a Spokane business, shortly after midnight on May 26, 2015. The State did not rest the murder in the first degree charge on an allegation of premeditated killing, but on an allegation that Akers entered the business premises without permission and with the intent to commit a crime. In other words, the State alleged the predicate crime of first degree burglary. On appeal, Akers challenges the trial court's conclusion that he entered the business premises without permission or remained on the premises without permission, not on whether he shot Medina. We focus then on his relationship and his intermittent girlfriend Vatsana Muongkhoth's connection to the premises of Northwest Accessories, not on the shooting.

During the early morning of May 26, 2015, Glenn Akers entered Northwest Accessories with Vatsana Muongkhoth. Akers met Muongkhoth in 2008. They dated until 2013, although they did not physically see one another after 2009 due to their respective imprisonments for conspiracy to commit first degree robbery. In 2013, Muongkhoth began intimately socializing with Ruben Marmolejo, a married man. Marmolejo was the uncle of victim Cesar Medina. Medina was 17 years old at the time of his death.

Ruben Flores, a colleague of Ruben Marmolejo since 2012, operated Northwest Accessories along North Monroe Street, in Spokane. Northwest Accessories marketed

pipes, glassware, apparel, and synthetic marijuana. Within Northwest Accessories'

building, Anthony Baumgarden operated a separate tattoo business. Baumgarden's tattoo

studio was located in the northeast side of the building. Surveillance cameras captured

activities in portions of Northwest Accessories' premises, and the trial court viewed

videotape of Glenn Akers' and Vatsana Muongkhoth's entrance and movements inside

the shop on May 26, 2015.

Ruben Flores poorly managed Northwest Accessories. He never formally hired

employees. Flores instead permitted friends to congregate at the shop and assist him with

running the business. Flores, however, only identified Ruben Marmolejo as one who

assisted him at the business. Marmolejo helped Flores to select pipes and bongs for

marketing and to display the paraphernalia.

The trial court heard conflicting testimony concerning Vatsana Muongkhoth's

association with Northwest Accessories. During direct examination, Muongkhoth

claimed she was both an employee and business partner at Northwest Accessories.

Muongkhoth testified that she sometimes collected money after the business closed and

performed bookkeeping. She delivered the money to Ruben Flores to deposit. She also

ordered inventory. She averred that she had a key to the business. According to

Muongkhoth, she could enter and leave the business premises whenever she wished.

When asked on cross-examination as to whether she was employed at Northwest

Accessories, Vatsana Muongkhoth answered: "'I don't—I was involved.'" Report of

3

Proceedings (RP) (May 29, 2018) at 755.  She testified that she received no paycheck.

When asked if she was "paid under the table," she answered: "'Yes, *I guess.*'"  RP (May

29, 2018) at 756 (emphasis added).  Muongkhoth had no agreement with Ruben Flores to

share the business income.

During the same time that Vatsana Muongkhoth allegedly worked at Northwest

Accessories, she worked, at least during the spring and summer, at a golf course.  She

conceded that she did not need employment at Northwest Accessories.  Muongkhoth did

not testify to any specific income she received from Northwest Accessories.

Anthony Baumgarden, the tattoo parlor operator, paid thirty percent of his income

to Ruben Marmolejo as rent.  Baumgarden testified he would leave the payment in an

envelope in his room or in a back office.  According to Baumgarden, Vatsana

Muongkhoth sometimes retrieved the envelope.

Ruben Marmolejo, Vatsana Muongkhoth's primary boyfriend, and Ruben Flores,

owner of Northwest Accessories, testified that Muongkhoth performed no services for

Northwest Accessories.  According to Marmolejo, Muongkhoth did not handle books or

records of the business.  Marmolejo denied that Muongkhoth had permission to be

present at Northwest Accessories without his presence.

Ruben Flores insisted that Vatsana Muongkhoth never assisted him in the

operation of Northwest Accessories.  Muongkhoth did not keep the business's books.

Flores denied that Muongkhoth's boyfriend, Ruben Marmolejo, was his silent partner.

4

Ruben Flores testified that only he could grant someone license to enter Northwest Accessories when the shop was closed. Even friends needed his permission to enter the building after hours.

Ruben Flores welcomed Vatsana Muongkhoth to Northwest Accessories' premises on occasion, even after business hours. Sometimes she came without the presence of Ruben Marmolejo, although she typically came to visit Marmolejo. Flores never told Muongkhoth she was not welcome at the shop. When stating the obvious, Flores declared that he would not allow Muongkhoth inside the premises in order to rob Northwest Accessories.

In the weeks preceding May 26, 2015, the date of the slaying, Glenn Akers and Vatsana Muongkhoth reignited their relationship. On the night of May 24, they bedded together in a hotel. During trial, Muongkhoth first denied having any intimate reuniting with Akers and refuted having gone to a hotel room with Akers during the week leading to the death of Cesar Medina. When confronted during questioning with a text wherein she asked Akers to spend the night with her on May 24, Muongkhoth first stated she could not remember having done so. After being challenged with a text that read: "'Will you get a room, baby,'" she conceded that Akers spent the night with her at her invitation and that she did not invite Akers to her home instead of a hotel because Ruben Marmolejo might learn of the assignation. RP (May 29, 2018) at 743-44.

5

On the morning of May 25, 2015, Glenn Akers discovered a duffel bag, containing firearms and cocaine, inside Vatsana Muongkhoth's Suburban. Akers surmised that the contraband belonged to Ruben Marmolejo.

On the night of May 25, 2015, Cesar Medina, Ruben Flores, Ruben Marmolejo, Anthony Baumgarden, Shane Zornes, and Juan Cervantes congregated at Northwest Accessories. The gentlemen drank and smoked marijuana. During this time, Vatsana Muongkhoth and Marmolejo argued via text messages regarding Marmolejo's failure to leave his wife and Muongkhoth's sexual relationship with Glenn Akers. Marmolejo sent threatening messages to Muongkhoth that included: "'Watch bitch! You fucked up bad over nothing over an old pic! U gonna see the worst of me I hope mommy and daddy have insurance.'" "'[T]he gallo is in full affect on my hood.'" Clerk's Papers (CP) at 403. The word "gallo" is Spanish for Rooster, Ruben Marmolejo's nickname. Muongkhoth returned texts to Marmolejo declaring: "'I fucking hate you.'" "'I hate you so much, I'm going to kill you.'" "'I hate you so fucking much.'" CP at 403. During one or more of the evening text messages, Ruben Marmolejo and Vatsana Muongkhoth agreed to meet at a gas station for the purpose of Muongkhoth returning the duffel bag to Marmolejo.

On May 25, at 9:30 p.m., Vatsana Muongkhoth traveled to Northwest Accessories, where she smashed, with a hammer, the back window of Ruben Marmolejo's BMW and pounded dents into the car's panel. Occupants of Northwest Accessories, including

6

Marmolejo, heard the clobbering of the car. These occupants opened an exit door and saw Muongkhoth run to her Suburban and flee in the car. After the BMW assault, Ruben Flores and Shane Zornes left Northwest Accessories in Marmolejo's BMW to purchase tattoo supplies for Anthony Baumgarden. Flores closed the head shop that night between 9 and 10 p.m. He believed he locked the outside doors.

At 10 p.m. on May 25, Vatsana Muongkhoth called Glenn Akers in a panic. She requested that Akers retrieve her from the residence of Brittany Verzal, a friend. She fretted that Ruben Marmolejo would kill Akers, her dogs, and her daughter and burn down her family's restaurant. She informed Akers that, in an effort to sever her relationship with Marmolejo, she wanted to return his duffle bag of contraband found in her car that morning. Akers traveled to Muongkhoth's friend's abode, and the two left the residence in the friend's vehicle.

During her trial testimony, Vatsana Muongkhoth denied remembering mingling with Glenn Akers on the evening of May 25. When shown a photograph of Akers with her taken on May 25, she conceded she had been with Akers.

Glenn Akers and Vatsana Muongkhoth drove to the prearranged rendezvous site of the gasoline station. Ruben Marmolejo, however, did not appear at the station. Marmolejo later texted Muongkhoth to meet him at a second locale, but he did not appear at the alternative location either. During their travels, Akers and Muongkhoth texted one another, despite sitting in the same car, because of the playing of loud music. At 11:23

7

p.m., Akers texted to Muongkhoth: "'lets [sic] go to the [Northwest Accessories] shop then.'" CP at 406. At 11:23, Muongkhoth replied: "'ok.'" CP at 406. Neither sent a message from 11:23 p.m. until 12:22 a.m. on May 26.

Glenn Akers and Vatsana Muongkhoth continued their odyssey in Brittany Verzal's conveyance to Northwest Accessories. En route, Akers and Muongkhoth passed Ruben Flores and Shane Zornes, in Ruben Marmolejo's BMW, as the BMW approached Northwest Accessories. Akers and Muongkhoth circled the block, as Flores and Zornes parked the BMW in the business' parking lot. Akers and Muongkhoth then parked near Northwest Accessories away from the view of those inside the shop. At that moment, Anthony Baumgarden administered a tattoo to Marmolejo inside the tattoo parlor.

During trial, Glenn Akers testified that, after the parking of the car, Vatsana Muongkhoth suddenly exited the vehicle with a firearm, and, from necessity, he snatched a firearm from Ruben Marmolejo's duffel bag and followed with the goal of retrieving Muongkhoth. Video surveillance shows that Akers and Muongkhoth entered the west entrance of Northwest Accessories. Video footage also shows darting movements, inside the building, thereafter of Akers, Muongkhoth, Ruben Flores, Cesar Medina, and Anthony Baumgarden. In short, Akers drew a gun, accosted Medina who was casually using a computer, and compelled him to lay prone on the sales floor while Akers pointed a gun at the boy's head. Baumgarden left his studio when he heard a commotion. From a hallway, Baumgarden threw a metal propane bottle at Akers in an attempt to free Medina

from the danger of Akers. In response, Akers fired one shot down the hallway. The round struck the south wall of the hallway, exited the building, and shattered an exterior light fixture. Baumgarden retreated to the basement.

Glenn Akers left Cesar Medina lying on the floor, jumped over a display case in the sales area, and retreated towards a bathroom, where Vatsana Muongkhoth was present. Medina stood and walked east down a small hallway. Akers suddenly pivoted and walked toward the hallway with his gun raised. The video does not capture Akers' movement for several seconds. The State contends that, during this brief span, Akers shot Medina. The security camera thereafter shows Akers and Muongkhoth exiting the building through the bathroom door, which provided access to the outdoors.

Glenn Akers testified that, while Cesar Medina walked the hallway, Medina reached for his waistband, but laid on the floor when Akers drew his gun. According to Akers, someone fired multiple shots at him and he fled in response. Akers denied that he intentionally fired his gun, but acknowledged that his gun discharged as he ran from the gunfire. The gunshot killed Medina.

During her trial appearance, Vatsana Muongkhoth testified that she did not go with Glenn Akers to Northwest Accessories early on the morning of May 26, nor was she present at Northwest Accessories at the time of the shooting. She denied entering Northwest Accessories that night despite video showing her presence in the shop and despite a return message to Akers reading: "'I want to get his [Ruben Marmolejo's] ass

at the shop cause his shit there.'"  RP (May 29, 2018) at 769.

PROCEDURE

The State of Washington charged Glenn Akers with murder in the first degree,

burglary in the first degree, assault of Anthony Baumgarden in the first degree,

conspiracy to commit robbery in the first degree, unlawful possession of a firearm in the

first degree, and tampering with a witness.  Akers waived his right to a jury trial and

proceeded to a bench trial.  He stipulated to knowingly possessing a firearm

The trial court found Akers guilty of burglary in the first degree and felony murder

in the first degree predicated on the burglary conviction.  The trial court also found Akers

guilty of assault in the first degree and unlawfully possessing a firearm in the first degree.

The court acquitted Akers of conspiracy to commit robbery in the first degree and

tampering with a witness.

The trial court entered extensive findings of fact and conclusions of law.  Those

findings relevant to this appeal include:

> 20.  Ms. Muongkhoth claimed she kept the books, ordered inventory,
> and deposited revenue for the business.  She asserts that she had full access
> to the shop, including possessing keys which allowed her access at any
> given time.  Mr. Flores minimized her involvement with the business as
> well as her access to the shop.
> . . . .
> 39.  Upon parking, Ms. Muongkhoth and Mr. Akers immediately
> exited the car leaving the headlights illuminated and Mr. Marmolejo's [sic]
> contraband inside.  While armed, they both dashed towards the west
> entrance of Northwest Accessories.
> . . . .

10

41. Video Surveillance showed Mr. Akers and Ms. Muongkhoth enter Northwest Accessories through the west door. . . .

. . . .

89. This [Glenn Akers'] testimony is inconsistent with most of the facts in this case. The defense claims that Ms. Muongkhoth was fearful of Mr. Marmolejo, that she was crying and upset earlier in the evening, that Mr. Marmolejo was an extremely violent person with access to firearms, that the others located inside Northwest Accessories were heavily armed, that Mr. Marmolejo was taking threats on Ms. Muongkhoth's life and against her parents' restaurant, and that Ms. Muongkhoth had earlier vandalized Mr. Marmolejo's BMW and that those at Northwest Accessories were laying in wait and ready to ambush them. If that were the case, it defies prudence to believe Mr. Akers and Ms. Muongkhoth would travel to Northwest Accessories to drop off Mr. Marmolejo's drugs and guns.

90. Even if that truly was their intent, it seems they could have simply dropped the duffle bag off on the back steps and sent Mr. Marmolejo a text message. Rather, upon arriving at Northwest Accessories, and in defiance of their stated plan, Ms. Muongkhoth immediately grabbed a gun, hopped out of the car and ran towards Northwest Accessories. According to Mr. Akers, his only choice was to acquire a gun out of Mr. Marmolejo's [sic] duffle bag and attempt to catch Ms. Muongkhoth.

. . . .

107. In addition to giving little weight to Ms. Stuhlmiller's [Glenn Akers' principal girlfriend with whom he lived] testimony, the Court is also skeptical of Ms. Muongkhoth's testimony. It seems she was continually impeaching herself before ever being cross-examined. She indicated she hadn't seen Mr. Akers for at least a week prior to May 25, 2015. She then conceded she was with him from the evening of May 24 through the early hours of May 26, 2015, with only a short period of being apart. She also testified that she and Mr. Akers were together while sending text messages to one another; this was due to them being together in her car but unable to speak to one another due to the radio being turned up too loudly.

CP at 402-11.

The trial court entered the following conclusions of law that relate to Glenn Akers'

unlawful entry and remaining within Northwest Accessories' shop:

5. The Court concludes Ms. Muongkhoth lacked the authority to either enter and/or remain in Northwest Accessories or to grant Mr. Akers permission to enter and/or remaining within Northwest Accessories. Even if the Court were to conclude that Mr. Flores granted Ms. Muongkhoth license to enter Northwest Accessories at will and invite in others, his authorization may be expressly or implicitly limited in scope. An invitee may exceed the scope of an invitation and, at that point, have entered or remained within a building unlawfully. *State v. Collins*, 110 Wn.2d 253 [751 P.3d 837 (1988)].

6. Certainly, any alleged license granted by Mr. Flores to Ms. Muongkhoth to enter or remain within Northwest Accessories or permit her to invite in others was not so broad as to allow she and Mr. Akers to race up to the building during the hours of darkness while armed with firearms, enter the building, assault occupants within the building, and discharge a firearm.

7. Assuming Ms. Muongkhoth had license to enter or remain within Northwest Accessories and invite in Mr. Akers, based upon the evidence presented, the scope of her perceived license and Mr. Akers' entry and remaining was exceeded; therefore, the Court finds beyond a reasonable doubt that, on or about May 26, 2015, Mr. Akers unlawfully entered or remained within Northwest Accessories.

. . . .

13. Here, after waiting for Mr. Marmolejo's BMW to return, Mr. Akers entered Northwest Accessories. Under the cover of darkness, and while armed with a firearm, Mr. Akers entered Northwest Accessories and promptly held Mr. Medina at gunpoint, which constitutes an assault. . . .

. . . .

15. The State has proven beyond a reasonable doubt that, on or about May 26, 2015, Mr. Akers entered or remained unlawfully in a building, that being Northwest Accessories; that the entering or remaining was with the intent to commit a crime against a person or property therein; that in so entering or while in the building or immediate flight from the building Mr. Akers, or an accomplice in the crime charged, was armed with a deadly weapon; and that these acts occurred at 3400 North Monroe, which is located in the city of Spokane and state of Washington; therefore, the Court finds Mr. Akers guilty of the crime of first-degree burglary as charged in Count II.

12

CP at 412-13.

At sentencing, the trial court found Glenn Akers to be a persistent offender and sentenced him to life without the possibility of parole. To make this determination, the court considered Glenn Akers' past criminal convictions, including: (1) assault in the second degree, committed in 2008; (2) burglary in the first degree, committed in 2009; (3) conspiracy to commit robbery in the first degree, committed in 2009; and (4) robbery in the first degree, committed in 2007.

Glenn Akers, born December 22, 1989, committed the 2007 robbery on July 26, 2007, at age 17. Akers was age 25 at the time of the murder of Cesar Medina. During sentencing, Akers did not challenge the constitutionality of the trial court's use of his juvenile conviction in calculating his number of convictions.

## LAW AND ANALYSIS

Glenn Akers challenges his convictions for first degree murder and first degree burglary, but not his other two convictions. He also challenges his sentence as a persistent offender. We address the assignments of error in such order.

### Convictions

Glenn Akers contends that the State of Washington presented insufficient evidence to convict him of first degree burglary because the State failed to prove he entered the premises of Northwest Accessories without permission or to remain on the premises

13

without permission. In turn, he contends that, since first degree burglary served as a predicate crime for his first degree felony murder conviction, the State also presented insufficient evidence to convict him of this higher crime. He makes no further argument to reverse his murder conviction. Thus, we focus on the burglary conviction.

A person commits first degree murder when, among other conduct, he or she commits the crime of burglary in the first degree and, in the course of such crime, he or she causes the death of a person other than one of the participants. RCW 9A.32.030(c). A defendant is guilty of first degree burglary:

> if, with intent to commit a crime against a person or property therein, *he or she enters or remains unlawfully in a building* and if, in entering or while in the building or in immediate flight therefrom, the actor or another participant in the crime (a) is armed with a deadly weapon, or (b) assaults any person.

RCW 9A.52.020(1) (emphasis added). "A person 'enters or remains unlawfully' in or upon premises when he or she is not then licensed, invited, or otherwise privileged to so enter or remain." RCW 9A.52.010(2).

Glenn Akers argues that he did not unlawfully enter or remain inside Northwest Accessories' shop because he accompanied Vatsana Muongkhoth, who had an unrestricted license to enter the business and who granted him access to the building. She could enter whenever she pleased and with whomever she pleased. According to Akers, insufficient evidence supported the trial court's conclusion that Muongkhoth held limited authority to enter the shop. He further argues that the court's ruling that Akers and

14

Muongkhoth exceeded the limited invitation to enter by sneaking into the building and by Akers' immediately drawing of a gun would turn every crime committed by a non-owner inside an entered building into a burglary.

The State denies that Ruben Flores granted Vatsana Muongkhoth permission to enter or remain within Northwest Accessories after business hours. The State adds that, even if the trial court concluded that Flores granted Muongkhoth license to enter Northwest Accessories and invite others in the middle of the night, Flores implicitly or expressly limited the scope of the authorization. She lacked a license to enter the premises and to allow someone to accompany her into the premises for the purpose of threatening the safety or life of others.

We question whether Vatsana Muongkhoth, assuming she possessed a license to enter the premises of Northwest Accessories beyond the license of any customer who shopped at the business, had authority to allow a third party, such as Glenn Akers, to enter the building with her. But we do not address this question. We also do not address whether Akers exceeded the limits of any license granted Muongkhoth by reason of his intent to wield a gun. We rest our decision on the trial court's finding and conclusion that both Vatsana Muongkhoth and Glenn Akers lacked permission to enter Northwest Accessories' shop after midnight.

Glenn Akers cites the principle that, even when one enters a building with a nefarious intent, the person does not commit burglary if he entered with permission.

*State v. Irby*, 187 Wn. App. 183, 199, 347 P.3d 1103 (2015). Another principle applies more directly to Akers' circumstances, however. A defendant's invitation to enter a building can be expressly or impliedly limited as to place or time. *State v. Thomson*, 71 Wn. App. 634, 638, 861 P.2d 492 (1993).

Glenn Akers accurately observes that the trial court entered no findings of fact concerning Vatsana Muongkhoth's authority to enter Northwest Accessories. Instead, in finding of fact 20, the trial court merely reiterated the testimony of Muongkhoth concerning her license to enter the building. Nevertheless, we conclude that conclusions of law 5 and 6 function in part as findings of fact that Muongkhoth lacked authority to enter the business premises whenever she pleased and in particular had no license to enter in the middle of the night. In conclusions of law 5 and 6, the trial court concluded that Muongkhoth either entered or remained in Northwest Accessories without permission and also lacked any authority to grant Glenn Akers to enter or remain inside the building.

We consider conclusions of law 5 and 6 to be both findings of fact and conclusions of law or mixed questions of law and fact, a phenomenon frequently recognized by Washington courts. *In re Marriage of Pennington*, 142 Wn.2d 592, 602-03, 14 P.3d 764 (2000); *Bill & Melinda Gates Foundation v. Pierce*, __ Wn. App. 2d ___, ___, 475 P.3d 1011, 1016 (2020). The line between a finding of fact and a conclusion of law can be challenging to identify. *Leschi Improvement Council v. Washington State Highway Commission*, 84 Wn.2d 271, 282-84, 525 P.2d 774, 804 P.2d

1 (1974) (plurality opinion). A finding of fact is the assertion that a phenomenon has happened or is or will be happening independent of or anterior to any assertion as to its legal effect. *State v. Williams*, 96 Wn.2d 215, 220-21, 634 P.2d 868 (1981). If a statement carries legal implications, the validity of the statement is a conclusion of law. *Para-Medical Leasing, Inc. v. Hangen*, 48 Wn. App 389, 397, 739 P.2d 717 (1987). This court treats findings or conclusions for what they are, not how they are labeled. *Stastny v. Board of Trustees of Central Washington University*, 32 Wn. App. 239, 246, 647 P.2d 496 (1982). We review a finding of fact erroneously labeled as a conclusion of law as a finding of fact. *Willener v. Sweeting*, 107 Wn.2d 388, 394, 730 P.2d 45 (1986); *Scott's Excavating Vancouver, LLC v. Winlock Properties, LLC*, 176 Wn. App. 335, 342, 308 P.3d 791 (2013).

Based on Washington precedent, we deem a method of analyzing the difference between a finding of fact and a conclusion of law is to ask how a layperson, uncorrupted by any legal training, would speak on the subject matter. On the occasion when the law and common parlance overlaps, a ruling by the trial court could be both a finding of fact and conclusion of law. In the circumstances of Glenn Akers' prosecution, a layperson would remark that Ruben Flores never permitted Vatsana Muongkhoth to enter Northwest Accessories at any hour of the day or night with or without a friend. The law would comment that Glenn Akers lacked permission or a license, within the meaning of RCW 9A.52.020(1) and RCW 9A.52.010(2), such that he entered and remained in the

17

building unlawfully within the meaning of RCW 9A.52.020(1) when he entered on May 26, 2015.

When writing in conclusion of law 5 that Vatsana Muongkhoth entered or remained in Northwest Accessories without permission and lacked any authority to grant Glenn Akers to enter, the trial court declared in essence, as a finding of fact, that Ruben Flores, the sole owner of Northwest Accessories, never permitted Muongkhoth to enter the building whenever she wished. The trial court also found that Flores never informed Muongkhoth that she possessed authority to invite others onto the property. Finally, by reason of conclusion of law 5, the trial court in essence found that, even if Flores granted such permission to Muongkhoth, she and Akers exceeded the permission by surreptitiously entering after midnight.

Glenn Akers' challenge to the sufficiency of the evidence is more in the nature of a contention that the findings of fact do not support the conclusions of law that Glenn Akers lacked authority to enter Northwest Accessories. When we read conclusions of law 5 and 6 as, in part, findings of fact, this contention fails. In addition, ample evidence supports the findings found in the two conclusions of law.

When analyzing whether sufficient evidence supports a defendant's conviction, this court views the evidence in the light most favorable to the prosecution and determines whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt. *State v. Homan*, 181 Wn.2d 102, 105, 330 P.3d 182 (2014).

18

Following a bench trial, the appellate court limits its review to determining whether substantial evidence supports the findings of fact. *State v. Homan*, 181 Wn.2d at 105-06. Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of the asserted premise. *State v. Homan*, 181 Wn.2d at 106.

We conclude that the overwhelming evidence supports the trial court's finding and conclusion of law that Glenn Akers lacked permission to enter and to remain inside Northwest Accessories' shop during the early morning of May 26, 2015. Ruben Flores testified that Vatsana Muongkhoth never assisted in the business. Although he welcomed Muongkhoth onto the premises, even sometimes after hours, Flores stated he reserved the right to deny even his friends entry, and no one testified that Flores authorized Muongkhoth to enter the premises after midnight with or without a friend. Ruben Marmolejo testified that Muongkhoth could not enter the premises as she saw fit.

Glenn Akers argues that the trial court did not resolve the factual dispute of whether Vatsana Muongkhoth had a business interest in Northwest Accessories. Akers also contends that the court failed to resolve whether Vatsana Muongkhoth possessed a key to the shop. In fact, Akers bases his argument that Muongkhoth enjoyed an unlimited license to enter Northwest Accessories on the assumption that she possessed a key and maintained a business interest in the shop.

We conclude that the failure of the court to expressly find that Muongkhoth possessed a business interest in the shop or to possess a key constitutes a negative finding

19

on the factual questions. The absence of a finding on a material issue is presumptively a negative finding entered against the party with the burden of proof. *State v. Budd*, 186 Wn. App. 184, 199, 347 P.3d 49 (2015), *aff'd*, 185 Wn.2d 566, 374 P.3d 137 (2016).

We note that the trial court, in finding of fact 20, set forth the allegations of Vatsana Muongkhoth concerning her permission to enter the building. But the court never adopted those allegations as findings. To the contrary, in finding of fact 107, the trial court found Muongkhoth to lack credibility and her own testimony thwarted her assertion of a business share and of possession of a key. We bestow deference to the trier of fact to evaluate the credibility of witnesses, to resolve conflicting testimony, and weigh the persuasiveness of evidence. *State v. Carver*, 113 Wn.2d 591, 604, 781 P.2d 1308, 789 P.2d 306 (1989).

Life without Parole Sentence

When sentencing Glenn Akers, the trial court sentenced Akers to life without the possibility of parole because of classifying him as a persistent offender under RCW 9.94A.030(37). The State of Washington and Akers agree that, to find Akers to be a persistent offender, the trial court counted a 2007 robbery in the first degree conviction. When Akers committed this 2007 offense, he was 17 years old, although the State tried him as an adult.

On appeal, Glenn Akers astutely contends that the trial court based his life sentence on a predicate of a juvenile offense in violation of the Eighth Amendment of the U.S. Constitution and article I, section 14 of the Washington State Constitution. Nevertheless, Akers did not, before the sentencing court, claim his sentence to be unconstitutional. Because he did not preserve any error before the trial court and because we find no manifest constitutional error, we decline to entertain the challenge to Akers' sentence.

RAP 2.5(a) declares:

> The appellate court may refuse to review any claim of error which was not raised in the trial court. However, a party may raise the following claimed errors for the first time in the appellate court: . . . (3) manifest error affecting a constitutional right.

To raise a manifest error on appeal, an appellant must demonstrate that the error is manifest and the error is truly of constitutional dimension. *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009). Manifest error is an "'error that is plain and indisputable, and that amounts to a complete disregard of the controlling law or the credible evidence in the record.'" *State v. O'Hara*, 167 Wn.2d at 100 n.1 (quoting BLACKS LAW DICTIONARY 622 (9th ed. 2009).

The Washington State Supreme Court has not expressed an opinion on whether the State may apply the Persistent Offender Accountability Act (POOA), chapter 9.94A RCW, to an offender who committed a strike offense as a juvenile and was convicted in

21

adult court. In *State v. Moretti*, 193 Wn.2d 809, 821 n.5, 446 P.3d 609 (2019), the court recognized that many state courts have held that, when sentencing an adult recidivist, it is not cruel and unusual to consider strike offenses when the offender was a juvenile. The court cited *United States v. Hoffman*, 710 F.3d 1228, 1233 (11th Cir. 2013); *United States v. Mays*, 466 F.3d 335, 340 (5th Cir. 2006); *State v. Green*, 412 S.C. 65, 85-87, 770 S.E.2d 424 (Ct. App. 2015); *Counts v. State*, 2014 Wy 151, 338 P.3d 902 (Wyo. 2014). A different panel of this court rejected the argument that article I, section 14 categorically bars imposition of a sentence to life without possibility of parole on adult offenders who committed a predicate offense under the POAA as a youth. *State v. Teas*, 10 Wn. App. 2d. 111, 131, 447 P.3d 606 (2019), *review denied*, 195 Wn.2d 1008, 460 P.3d 182 (2020).

We encourage the Washington Supreme Court to directly address this important constitutional issue. Because the law does not clearly support Glenn Akers' position, we decline to do so for the first time on appeal.

CONCLUSION

We affirm Glenn Akers' convictions for first degree burglary and first degree murder and his sentence as a persistent offender.

No. 36213-2-III
*State v. Jeremiah A. Smith aka Glenn Akers*


A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, J.


WE CONCUR:


_____
Lawrence-Berrey, J.

_____
Pennell, C.J.